UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Case No.:

GOVERNMENT EMPLOYEES INSURANCE
CO., GEICO INDEMNITY CO., GEICO
GENERAL INSURANCE COMPANY and
GEICO CASUALTY CO.,
     Plaintiffs,                                  **Jury Trial Demand**

vs.

MICHAEL T. LAROCCA, D.C., LAROCCA
CHIROPRACTIC CENTERS, LLC, ALL
ACCIDENTS CHIROPRACTIC CENTER,
PLLC, LAROCCA CHIROPRACTIC INJURY
CENTER LLC, and LAROCCA AUTO
INJURY CENTER LLC.,
     Defendants.

_____

## COMPLAINT

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General

Insurance Company, and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), sue

Defendants and allege as follows:

1.      This action seeks to recover more than $10,750,000.00 that Defendants wrongfully

obtained from GEICO by submitting thousands of fraudulent and unlawful no-fault ("no-fault",

"personal injury protection", or "PIP") insurance charges through Defendants LaRocca

Chiropractic Centers, LLC ("LaRocca Chiropractic"), All Accidents Chiropractic Center, PLLC

("All Accidents"), LaRocca Chiropractic Injury Center LLC ("LaRocca Chiropractic Injury"), and

LaRocca Auto Injury Center LLC ("LaRocca Auto") (collectively the "LaRocca Practices"),

relating to medically unnecessary, illusory, unlawful, and otherwise non-reimbursable health care

services and goods, including purported examinations, physical therapy services, chiropractic

1

services, and home medical equipment ("HME") (collectively the "Fraudulent Services"), that purportedly were provided to Florida automobile accident victims ("Insureds") who were eligible for coverage under GEICO no-fault insurance policies.

2.      In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $75,000.00 in pending, fraudulent and unlawful PIP claims that Defendants have submitted through the LaRocca Practices because:

(i)      at all relevant times, Defendants operated in violation of Florida law, including Florida's Health Care Clinic Act, Fla. Stat. § 400.990 et seq. (the "Clinic Act"), Florida's False and Fraudulent Insurance Claims Statute, Fla. Stat. § 817.234(7) (the "False and Fraudulent Insurance Claims Statute"), Florida's Patient Brokering Act, Fla. Stat. § 817.505 (the "Patient Brokering Act"), and Florida's Anti-Kickback Statute, Fla. Stat. § 456.054 (the "Anti-Kickback Statute");

(ii)     the underlying Fraudulent Services were not medically necessary, and were provided – to the extent provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly received the Fraudulent Services;

(iii)    in many cases, the Fraudulent Services were never legitimately provided in the first instance;

(iv)     Defendants' billing for the Fraudulent Services misrepresented the nature, extent, and results of the Fraudulent Services, in order to fraudulently inflate the charges submitted to GEICO; and

(v)      Defendants' billing for the Fraudulent Services misrepresented the identities of the individuals who performed or directly supervised the Fraudulent Services, and was submitted in violation of the billing requirements set forth in the Florida Motor Vehicle No-Fault Law, Fla. Stat. §§ 627.730-627.7405 (the "No-Fault Law").

3.      Each charge submitted through the LaRocca Practices to GEICO since at least 2019 has been fraudulent and unlawful for the reasons set forth herein. The charts annexed hereto as Exhibits "1" – "4" set forth a large and representative sample of the fraudulent and unlawful claims that have been identified to date that have been submitted to GEICO by mail through the LaRocca Practices.

4.      Defendants' fraudulent scheme began no later than 2019, and has continued uninterrupted since that time.

## THE PARTIES

### I.      Plaintiffs

5.      Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively, "GEICO") are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in Florida.

### II.      Defendants

6.      Defendant Michael T. LaRocca, D.C. ("LaRocca") is a resident and citizen of Florida.

7.      LaRocca was licensed to practice chiropractic on or about November 3, 1976, but has never been a licensed physician.

8.      LaRocca owned, controlled, and was the sole member of the LaRocca Practices, falsely purported to perform or directly supervise the vast majority of the Fraudulent Services at the LaRocca Practices, falsely purported to supervise the business activities at the LaRocca Practices, and used the LaRocca Practices as vehicles to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

9.      Defendants LaRocca Chiropractic is a Florida limited liability company with its principal place of business in Clearwater, Florida.

10.      LaRocca Chiropractic was organized on or about July 19, 2010, had LaRocca as its member and owner, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

3

11.     At all relevant times, LaRocca Chiropractic falsely reported to be exempt from the Clinic Act's health care clinic licensure requirements pursuant to Fla. Stat. § 400.9905(4)(g).

12.     All Accidents is a Florida professional limited liability company with its principal place of business in St. Petersburg, Florida.

13.     All Accidents was organized on or about February 5, 2010, had LaRocca as its member and owner, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

14.     At all relevant times, All Accidents falsely reported to be exempt from the Clinic Act's health care clinic licensure requirements pursuant to Fla. Stat. § 400.9905(4)(g).

15.     LaRocca Chiropractic Injury is a Florida limited liability company with its principal place of business in Temple Terrace, Florida.

16.     LaRocca Chiropractic Injury was organized on or about May 9, 2011, had LaRocca as its member and owner, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

17.     At all relevant times, LaRocca Chiropractic Injury falsely reported to be exempt from the Clinic Act's health care clinic licensure requirements pursuant to Fla. Stat. § 400.9905(4)(g).

18.     LaRocca Auto is a Florida limited liability company with its principal place of business in Land O Lakes, Florida.

19.      LaRocca Auto was organized on or about June 20, 2017, had LaRocca as its member and owner, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

20.     At all relevant times, LaRocca Auto falsely reported to be exempt from the Clinic Act's health care clinic licensure requirements pursuant to Fla. Stat. § 400.9905(4)(g).

**III.     Other Relevant Individual at the LaRocca Practices**

21.     Although GEICO has not named him as a Defendant in this action, Cecilio Torres-Ruiz, M.D. ("Torres-Ruiz") is relevant to understanding the Defendants' fraudulent and unlawful scheme and the claims that Plaintiffs assert in this case.

22.     Torres-Ruiz is a licensed physician who was employed by or associated with LaRocca and the LaRocca Practices,.

23.     Torrez-Ruiz, at Defendants' direction, purported to perform medical examinations at the LaRocca Practices, during which he would routinely falsely diagnose Insureds with "Emergency Medical Conditions" in order to increase the amount of fraudulent, unlawful, and non-reimbursable PIP billing that the Defendants could submit to GEICO and other insurers.

**JURISDICTION AND VENUE**

24.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.

25.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

26.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

27.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Middle District of Florida is the District where one or more of Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS

I.     **Overview of Pertinent Law Governing PIP Insurance Reimbursement**

28.     Florida requires automobile insurers such as GEICO to provide PIP insurance benefits ("PIP Benefits") to Insureds when they are injured in a motor vehicle accident. See Florida Motor Vehicle No-Fault Law, Fla. Stat. §§ 627.730-627.7405 (the "No-Fault Law").

29.     Under the No-Fault Law, a health care services provider that possesses a valid assignment of PIP Benefits from an Insured and that provides medically necessary health care services to an Insured may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form" or "CMS-1500" form).

30.     In order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided, medically necessary, and the bill for the service cannot misrepresent the nature or extent of the service that was provided, or who performed or directly supervised the service. Furthermore, insurers such as GEICO are not required to pay anyone who knowingly submits a false or misleading statement relating to a PIP claim or charges.  See Fla. Stat. § 627.736.

31.     By listing a health care practitioner in Box 31 of a HCFA-1500 form, the billing provider represents that the practitioner performed or directly supervised the underlying services, and "[t]o directly supervise, a doctor must be physically present at the facility". See Medicare Claims Processing Manual, Chapter 26, Item 31.

32.     Additionally, in order for a health care service to be eligible for PIP reimbursement, the applicable claim form must set forth the professional license number of the provider who personally performed or directly supervised the underlying health care service, in the line or space provided for "Signature of Physician or Supplier, Including Degrees or Credentials." See Fla. Stat. § 627.736.

33.     Insurers such as GEICO are not required to pay PIP Benefits to health care providers that misrepresent, in their billing, the identity of the individual health care practitioner who performed or directly supervised the underlying services.

34.     Under the False and Fraudulent Insurance Claims Statute, it is unlawful for a health care provider to engage in the general business practice of waiving, or failing to make a good-faith effort to collect, co-payments or deductibles from PIP patients. See Fla. Stat. § 817. 234(7).

35.     Failure to make a good-faith effort to collect co-payments or deductibles renders the charges submitted by a health care provider unlawful and noncompensable.

36.     Furthermore, Florida's Patient Brokering Act, Fla. Stat. § 817.505, broadly prohibits any person from offering, paying, soliciting, or receiving any commission, bonus, rebate, kickback, or bribe – directly or indirectly, in cash or in kind – or from engaging in any fee-splitting arrangement of any type whatsoever, to either induce a patient referral or in exchange for a patient referral.

37.     Likewise, Florida's Anti-Kickback Statute, Fla. Stat. § 456.054, prohibits any health care provider from offering, paying, soliciting, or receiving a kickback, directly or indirectly, overtly or covertly, in cash or in kind, in exchange for patient referrals. Violations of the Anti-Kickback Statute also constitute violations of the Patient Brokering Act.

38.     Insurers such as GEICO are not required to make any payments of PIP Benefits to clinics and other health care providers that operate in violation of the Patient Brokering Act or Anti-Kickback Statute, whether or not the underlying health care services were medically necessary or actually provided.

39.     PIP reimbursement for health care services is limited to $2,500.00 per injured person, unless a physician, physician assistant, or advanced practice registered nurse determines that the injured person suffered from an "emergency medical condition", in which case health care providers can be reimbursed up to $10,000.00 for health care services. See Fla. Stat. § 627.736.

40.     Pursuant to the No-Fault Law, an "emergency medical condition" means a "medical condition manifesting itself by acute symptoms of sufficient severity, which may include severe pain, such that the absence of immediate medical attention could reasonably be expected to result in any of the following: (a) serious jeopardy to patient health. (b) serious impairment to bodily functions. (c) serious dysfunction of any bodily organ or part." Fla. Stat. § 627.732.

41.     Subject to certain limited exceptions, a license issued by the Florida Agency for Health Care Administration is required in order to operate a "clinic" in Florida. See Fla. Stat. § 400.991(1)(a). The Clinic Act defines "clinic" to mean "an entity where health care services are provided to individuals and which tenders charges for reimbursement for such services, including a mobile clinic and a portable equipment provider." See Fla. Stat. § 400.9905.

42.     However, the Clinic Act provides an exemption from the clinic licensing requirements for:

> A sole proprietorship, group practice, partnership, or corporation that provides health care services by licensed health care practitioners . . . that is wholly owned by one or more licensed health care practitioners, or the licensed health care practitioners set forth in this paragraph and the spouse, parent, child, or sibling of a licensed health care practitioner if one of the owners who is a licensed health care practitioner is supervising the business activities and is legally responsible for the entity's compliance with all federal and state

laws. However, a health care practitioner may not supervise services beyond the scope of the practitioner's license … .

Fla. Stat. § 400.9905(4)(g).

43.     Therefore, in order for a health care practice to qualify for this "wholly owned" exemption under the Clinic Act, the licensed health care practitioner who "wholly owns" the practice has a continuing obligation to legitimately supervise the business activities of the clinic and remain legally responsible for the clinic's compliance with all federal and state laws.

44.     Furthermore, in order for a health care practice to qualify for the "wholly owned" exemption to the Clinic Act's licensing requirements, the practice may not provide services that are outside of the scope of the supervising practitioner-owner's professional license.

45.     Pursuant to the Clinic Act, health care practices operating in Florida without a valid exemption from the health care clinic licensing requirements must – among other things – appoint a medical director who must "[c]onduct systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful", and take immediate corrective action upon discovery of a fraudulent or unlawful charge. See Fla. Stat. § 400.9935(1).  In addition, a clinic medical director must "[e]nsure that all health care practitioners at the clinic have active appropriate certification or licensure for the level of care being provided." See Fla. Stat. § 400.9935(1).

46.     Pursuant to the Clinic Act, "[a] charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed . . . but that is not so licensed, or that is otherwise operating in violation of this part . . . is an unlawful charge" and is ineligible for payment. See Fla. Stat. § 400.9935(3).

## II.     **The Defendants' Fraudulent and Unlawful Scheme**

47.     Since at least 2019, and continuing through the present day, the Defendants devised and implemented a fraudulent and unlawful scheme pursuant to which they billed GEICO millions of dollars for unlawful, medically unnecessary, illusory, and otherwise non-reimbursable Fraudulent Services.

**A.     Defendants' Unlawful Operation of the LaRocca Practices in Violation of the Clinic Act**

48.     As part of the Defendants' fraudulent and unlawful scheme, LaRocca operated the LaRocca Practices in pervasive violation of the Clinic Act.

49.     The LaRocca Practices were all "clinics" within the meaning of the Clinic Act, in that there were entities "where health care services [were] provided to individuals and which tender[ed] charges for reimbursement for services."

50.     However, none of the LaRocca Practices had a clinic license or a medical director.

51.     Instead, the LaRocca Practices were – at all times – owned by LaRocca, and purported to operate under the "wholly owned" exemption from the Clinic Act's licensing and regulatory requirements.

52.      However, the LaRocca Practices could only qualify for the "wholly owned" exemption if they were owned by licensed health care practitioners who legitimately supervised their business activities and remained legally responsible for their compliance with all federal and state laws.

53.     LaRocca never legitimately supervised the business activities of the LaRocca Practices, inasmuch as LaRocca never conducted legitimate reviews of the billing or treatment records from the LaRocca Practices to ensure that the billing was not fraudulent or unlawful, and

– to the contrary – directed the submission of the fraudulent and unlawful charges through the LaRocca Practices to GEICO and other insurers.

54.     Indeed, given the fraudulent treatment and billing activities described below – which were pervasive across all of the billing submitted to GEICO through the LaRocca Practices – there is no way that LaRocca could have legitimately supervised the business activities of those clinics to ensure that the billing was not fraudulent.

55.     Had LaRocca legitimately supervised the business activities of the LaRocca Practices, he would have noted, among other things, that:

(i)     The LaRocca Practices were – as set forth herein – operated in pervasive violation of Florida law, including the Clinic Act, the Patient Brokering Act, the Anti-Kickback Statute, the No-Fault Law, and the False and Fraudulent Insurance Claims Statute;

(ii)    The LaRocca Practices unlawfully engaged in the general business practice of waiving, or failing to make a good-faith effort to collect, co-payments and deductibles from their patients in violation of Florida law;

(iii)   The LaRocca Practices routinely misrepresented the identities of the individual health care practitioners who actually performed or directly supervised the Fraudulent Services billed through the LaRocca Practices to GEICO;

(iv)    the Fraudulent Services purportedly provided by and billed through the LaRocca Practices were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol;

(v)     in many cases, the Fraudulent Services purportedly provided by and billed through the LaRocca Practices were never provided in the first instance; and

(vi)    the billing codes used for the Fraudulent Services purportedly provided by and billed through the LaRocca Practices misrepresented and exaggerated the level of services that were provided in order to fraudulently inflate the charges submitted to GEICO.

56.     In fact, LaRocca could not legitimately have supervised the LaRocca Practices' business activities, because the LaRocca Practices purported to provide health care services that were beyond the scope of LaRocca's chiropractic license.

57.     As set forth above, LaRocca is a chiropractor. LaRocca is not, and has never been, licensed as a medical doctor or in any other health care field other than in chiropractic.

58.     Even so, and in keeping with the fact that LaRocca could not legitimately have supervised the business activities of the LaRocca Practices, the LaRocca Practices regularly employed medical doctors, including Torres-Ruiz, and purported to provide services – such as medical examinations – that were beyond the scope of LaRocca's chiropractic license.

59.     Accordingly, none of the LaRocca Practices ever qualified for the "wholly owned" exemption from licensure as "health care clinics" set forth in Section 400.9905(4)(g). Nor did any of the LaRocca Practices qualify for any other exemption to the Clinic Act, or have medical directors as required for a health care clinic without an exemption. As a result, all the LaRocca Practices operated – at all relevant times – in violation of the Clinic Act.

**B.     Defendants' Violations of the Patient Brokering Act and the Anti-Kickback Statute**

60.     Defendants needed to ensure a steady flow of patients into the LaRocca Practices, so that they could submit billing to GEICO and other insurers and generate profits.

61.     However, there was not a sufficient, legitimate demand for the fraudulent, unlawful, medically unnecessary, and illusory health care services that Defendants purported to provide through the LaRocca Practices.

62.     Accordingly, the LaRocca Practices and LaRocca sought out a means by which they could obtain a steady flow of patients to receive large amounts of medically unnecessary physical therapy and chiropractic "treatments" at the LaRocca Practices which would, in turn, allow the Defendants to submit a high volume of fraudulent billing through the LaRocca Practices to GEICO and other insurers.

63.     Toward that end, the LaRocca Practices and LaRocca provided unlawful compensation to other health care providers and lawyers (collectively the "Referral Sources") in exchange for patient referrals from these Referral Sources for medically unnecessary and illusory "treatment".

64.      In particular, Defendants hired purported "marketers", whom they paid to induce the Referral Sources to refer patients to the LaRocca Practices and LaRocca for medically unnecessary and illusory "treatment".

65.     To induce the Referral Sources to refer patients to the LaRocca Practices and LaRocca, the "marketers", at Defendants' direction, provided valuable gifts to the Referrals Sources in exchange for patient referrals for medically unnecessary Fraudulent Services.

66.     In the claims identified in Exhibits "1" – "4", Defendants routinely violated the Patient Brokering Act and Anti-Kickback Statute in this manner, and thereby falsely represented that the underlying health care services were lawfully provided and reimbursable, when in fact they were not.

**C.     Defendants' Violations of the False and Fraudulent Insurance Claims Statute**

67.     At all relevant times, Defendants unlawfully engaged in the general business practice of waiving, or failing to make a good-faith effort to collect co-payments and deductibles from their patients in violation of the False and Fraudulent Insurance Claims Statute.

68.     In keeping with this fact, in virtually all of the thousands of bills (i.e., the HCFA-1500 forms) submitted through the LaRocca Practices to GEICO for the Defendants' Fraudulent Services, the LaRocca Practices represented that they did not collect any money, whether it be a co-payment or a deductible, from the Insureds.

69.     In the claims identified in Exhibits "1" – "4", LaRocca and the LaRocca Practices routinely falsely represented that the underlying health care services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable because Defendants engaged in the general business practice of waiving, or failing to make a good-faith effort to collect, co-payments and deductibles from their patients in violation of the  False and Fraudulent Insurance Claims Statute.

**D.    Defendants' Misrepresentations Regarding the Identities of the Treating Practitioners at the LaRocca Practices**

70.     In the vast majority the bills submitted through the LaRocca Practices to GEICO, including bills for purported "physical therapy" services, Defendants input LaRocca's name in Box 31 of the HCFA-1500 forms/bills, thereby representing that LaRocca was physically present in the LaRocca Practices' office suites to perform or directly supervise these Fraudulent Services.

71.     In fact, however, Defendants' bills routinely falsely represented that LaRocca was physically present in the LaRocca Practices' office suites to perform or directly supervise the Fraudulent Services, when in fact he was not.

72.     In keeping with this fact, LaRocca – who was in his mid-to-late 70s at the time – often purported to personally perform or directly supervise more than 20, 25, or even 30 hours of services for GEICO Insureds on individual dates, often at numerous different clinics and locations, per day.

73.     For example:

(i)     On May 17, 2021, LaRocca and the LaRocca Practices purported to provide at least 125 individual physical therapy services, at no less than 11 different locations, to at least 48 individual Insureds, and falsely contended in the resulting bills to GEICO that LaRocca personally performed or directly supervised every one of those treatments. What is more, those putative treatments included at least 21.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services.

(ii)     On May 25, 2021, LaRocca and the LaRocca Practices purported to provide at least 137 individual physical therapy services, at no less than nine different locations, to at least 56 individuals, and falsely contended in the resulting bills to GEICO that LaRocca personally performed or directly supervised every one of those treatments. What is more, those putative treatments included at least 24.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services.

(iii)    On November 1, 2021, LaRocca and the LaRocca Practices purported to provide at least 126 individual physical therapy services, at no less than 11 different locations, to at least 45 individual Insureds, and falsely contended in the resulting bills to GEICO that LaRocca personally performed or directly supervised every one of those treatments. What is more, those putative treatments included at least 22.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services.

(iv)     On November 22, 2021, LaRocca and the LaRocca Practices purported to provide at least 143 individual physical therapy services, at no less than 10 different locations, to at least 50 individuals, and falsely contended in the resulting bills to GEICO that LaRocca personally performed or directly supervised every one of those treatments. What is more, those putative treatments included at least 25.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services.

(v)      On December 2, 2021, LaRocca and the LaRocca Practices purported to provide at least 116 individual physical therapy services, at no less than nine different locations, to at least 44 individual Insureds, and falsely contended in the resulting bills to GEICO that LaRocca personally performed or directly supervised every one of those treatments. What is more, those putative treatments included at least 20.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services.

(vi)     On February 24, 2022, LaRocca and the LaRocca Practices purported to provide at least 119 individual physical therapy services, at no less than 10 different locations, to at least 41 individual Insureds, and falsely contended in the resulting bills to GEICO that LaRocca personally performed or directly supervised every one of those treatments. What is more, those putative treatments included at least 20 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services.

(vii)    On April 11, 2022, LaRocca and the LaRocca Practices purported to provide at least 111 individual physical therapy services, at no less than 11 different locations, to at least 38 individual Insureds, and falsely contended in the resulting bills to GEICO that LaRocca personally performed or directly supervised every one of those treatments. What is more, those putative treatments included at least 21.25

hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services.

(viii)   On April 14, 2022, LaRocca and the LaRocca Practices purported to provide at least 108 individual physical therapy services, at no less than 10 different locations, to at least 47 individual Insureds, and falsely contended in the resulting bills to GEICO that LaRocca personally performed or directly supervised every one of those treatments. What is more, those putative treatments included at least 19 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services.

(ix)   On October 4, 2022, LaRocca and the LaRocca Practices purported to provide at least 111 individual physical therapy services, at no less than 10 different locations, to at least 40 individual Insureds, and falsely contended in the resulting bills to GEICO that LaRocca personally performed or directly supervised every one of those treatments. What is more, those putative treatments included at least 20 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services.

(x)   On May 14, 2023, LaRocca and the LaRocca Practices purported to provide at least 129 individual physical therapy services, at no less than seven different locations, to at least 29 individual Insureds, and falsely contended in the resulting bills to GEICO that LaRocca personally performed or directly supervised every one of those treatments. What is more, those putative treatments included at least 18.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services.

74.   These are only representative examples. It is improbable, to the point of impossibility, that LaRocca – who was simultaneously working or purporting to work at numerous different locations on individual dates – routinely performed or directly supervised such a massive volume of services on those dates.

75.   Upon information and belief, the fraudulent billing for the services that Defendants submitted or caused to be submitted through the LaRocca Practices to GEICO constituted only a fraction of the <u>total</u> fraudulent billing for services that the Defendants submitted through the LaRocca Practices to <u>all</u> of the automobile insurers in the Florida automobile insurance market.

76.   It is not credible that Defendants only submitted fraudulent billing to GEICO, and that Defendants did not simultaneously bill other automobile insurers.

77.     Thus, upon information and belief, the impossible number of services that LaRocca purported to directly supervise or perform for GEICO Insureds at the LaRocca Practices on individual dates of service constituted only a fraction of the total number of services that LaRocca purported to directly supervise or perform at the LaRocca Practices, including for individuals insured by companies other than GEICO, on those same dates of service.

78.     In this context, LaRocca – who at all relevant times purported to own the LaRocca Practices – did not, and could not have, legitimately supervised the business activities of the LaRocca Practices.

79.     Had LaRocca actually supervised the business activities of the LaRocca Practices, he would have noted – among other things – that the LaRocca Practices routinely misrepresented, in Box 31 of the HCFA-1500 billing forms they submitted, the identity of the person who actually performed or directly supervised the underlying health care services.

80.     LaRocca failed to do so, because he never actually supervised the business activities of the LaRocca Practices.

**E.     Defendants' Fraudulent and Unlawful Treatment and Billing Protocols**

81.     In the claims identified in Exhibits "1" – "4", almost none of the Insureds whom Defendants purported to treat suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced.

82.     Even so, in the claims identified in Exhibits "1" – "4", Defendants purported to subject virtually every Insured to a medically unnecessary course of "treatment" that was provided pursuant to pre-determined, fraudulent protocols designed to maximize the billing that they could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

83.     The Defendants purported to provide their pre-determined fraudulent treatment protocols to the Insureds in the claims identified in Exhibits "1" – "4", without regard for the Insureds' individual symptoms or presentation, or – in most cases – the total absence of any actual continuing medical problems arising from any actual automobile accidents.

84.     Each step in Defendants' fraudulent treatment protocols was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit Defendants to generate and falsely justify the maximum amount of fraudulent PIP billing for each Insured.

85.     No legitimate physician, chiropractor, clinic, or other health care provider would permit the fraudulent treatment and billing protocols described below to proceed under his, her, or its auspices.

86.     Defendants permitted the fraudulent treatment and billing protocols described below to proceed under their auspices because: (i) the LaRocca Practices were, at all relevant times, operating in violation of the Clinic Act, without legitimate oversight or medical directors; and (ii) Defendants sought to profit from the fraudulent billing they submitted to GEICO and other insurers.

**1.     The Fraudulent and Unlawful Claims for Initial Examinations at the LaRocca Practices**

87.     As an initial step in Defendants' fraudulent treatment and billing protocol, LaRocca and the LaRocca Practices purported to provide the Insureds in the claims identified in Exhibits "1" – "4" with initial examinations.

88.     The examinations purportedly were performed by LaRocca and various other health care practitioners who were employed by or associated with LaRocca and the LaRocca Practices and who worked at their direction, including Torres-Ruiz.

18

89.     As set forth in Exhibits "1" – "4", Defendants then virtually always billed the initial examinations to GEICO, or caused them to be billed to GEICO, under: (i) CPT code 99203, typically resulting in a charge between $218.00 and $225.00 for each putative examination; or (ii) CPT code 99204, typically resulting in a charge of $333.00 for each putative examination.

90.     Pursuant to the American Medical Association's CPT Assistant, which governs reimbursement of PIP claims, at all relevant times:

(i)     the use of CPT code 99203 to bill for an initial patient examination represented – among other things – that: (a) the patient presented with problems of moderate severity; (b) the physician or chiropractor who conducted the examination spent at least 30 minutes of time performing the examination; and (c) the physician or chiropractor who performed the examination engaged in legitimate "low complexity" medical decision-making in connection with the examination; and

(ii)    the use of CPT code for 99204 to bill for an initial patient examination represented – among other things – that: (a) the patient presented with problems of moderate to high severity; (b) the physician or chiropractor who conducted the examination spent at least 45 minutes of time performing the examination; and (c) the physician or chiropractor who performed the examination engaged in legitimate "moderate complexity" medical decision-making in connection with the examination.

91.     In the claims for initial examinations identified in Exhibits "1" – "4", the charges for the initial examinations were fraudulent in that they misrepresented Defendants' eligibility to collect PIP Benefits in the first instance.

92.     In fact, Defendants never were eligible to collect PIP Benefits, inasmuch as they operated in violation of Florida law.

93.     Moreover, as set forth below, the charges for the initial examinations identified in Exhibits "1" – "4" also were fraudulent in that they misrepresented the extent, nature, results, and medical necessity of the initial examinations.

a.     **Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

94.    To the extent that the Insureds in the claims identified in Exhibits "1" – "4" had any presenting problems at all as the result of their typically-minor automobile accidents, the problems virtually always were low or minimal severity soft tissue injuries such as sprains and strains.

95.    For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibits "1" – "4" either had no presenting problems at all as the result of their relatively minor automobile accidents, or else problems of low or minimal severity, in many of the claims identified in Exhibits "1" – "4" the contemporaneous police reports indicated that the underlying accidents involved relatively low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

96.    What is more, in most of the claims identified in Exhibits "1" – "4" the Insureds did not seek treatment at any hospital as the result of their accidents.

97.    To the limited extent that the Insureds in the claims identified in Exhibits "1" – "4" did seek treatment at a hospital following their accidents, they almost always were briefly observed on an outpatient basis, and then discharged with nothing more serious than a minor soft tissue injury diagnosis.

98.    Even so, when billing GEICO for initial examinations using CPT codes 99203 or 99204 in the claims identified in Exhibits "1" – "4", Defendants falsely represented that the Insureds presented with problems of moderate or moderate to high severity, when in fact the Insureds' problems were low or minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all at the time of the examinations.

99.    For example:

(i)     On March 28, 2018, an Insured named OM was involved in an automobile accident. The contemporaneous police report indicated that OM's vehicle was drivable following the accident. The police report further indicated that OM was not injured as a result of the accident. In keeping with the fact that OM was not seriously injured as a result of the accident, OM was not transported to any hospital emergency department following the accident. To the extent that OM experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination on April 4, 2021, LaRocca Auto and LaRocca billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that OM presented with problems of moderate severity.

(ii)    On March 8, 2019, an Insured named NP was involved in an automobile accident. The contemporaneous police report indicated that NP was not injured as a result of the accident. The police report further indicated that NP was not transported to any hospital emergency department following the accident. To the extent that NP experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination on April 30, 2019 – nearly two months following the accident – LaRocca Chiropractic Injury and LaRocca billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that NP presented with problems of moderate to high severity.

(iii)   On June 14, 2019, an Insured named WR was involved in an automobile accident. The contemporaneous police report indicated that WR sustained possible injures as a result of the accident. The police report further stated that WR was not transported to any hospital emergency department following the accident. To the extent that WR experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination on July 3, 2020, LaRocca Auto and LaRocca billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that WR presented with problems of moderate to high severity.

(iv)    On July 6, 2019, an Insured named BB was involved in an automobile accident. The contemporaneous police report indicated that BB was not injured as a result of the accident. The police report further indicated that BB was not transported to any hospital emergency department following the accident. To the extent that BB experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination on July 11, 2019, All Accidents and LaRocca billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that BB presented with problems of moderate to high severity.

(v)     On July 19, 2019, an Insured named DG was involved in an automobile accident. Police were not called to the scene, and therefore, no contemporaneous police report was created. DG did not visit any hospital emergency department following

the accident. To the extent that DG experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination on August 1, 2019, LaRocca Chiropractic and LaRocca billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that DG presented with problems of moderate to high severity

(vi)     On October 26, 2019, an Insured named JA was involved in an automobile accident. The contemporaneous police report indicated that JA was not injured as a result of the accident. The police report further indicated that JA was not transported to any hospital emergency department following the accident. To the extent that JA experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination on November 12, 2019, LaRocca Chiropractic Injury LaRocca billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that JA presented with problems of moderate to high severity.

(vii)    On January 14, 2020, an Insured named SZ was involved in an automobile accident. The contemporaneous police report indicated that SZ's vehicle was drivable following the accident. The police report further indicated that SZ was not injured as a result of the accident. In keeping with the fact that SZ was not seriously injured as a result of the accident, SZ was not transported to any hospital emergency department following the accident. To the extent that SZ experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination on January 28, 2020, LaRocca Chiropractic Injury and LaRocca billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that SZ presented with problems of moderate to high severity

(viii)   On May 24, 2020, an Insured named ML was involved in an automobile accident. The contemporaneous police report indicated that ML's vehicle drivable following the accident. The police report further indicated that ML was not injured as a result of the accident. In keeping with the fact that ML was not seriously injured as a result of the accident, ML was not transported to any hospital emergency department. To the extent that ML experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination on July 7, 2020 – over five weeks after the accident – All Accidents and LaRocca billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that ML presented with problems of moderate to high severity.

(ix)     On June 19, 2020, an Insured named DL was involved in an automobile accident. The contemporaneous police report indicated that DL was not injured as a result of the accident. The police report further indicated that DL was not transported to any hospital emergency department following the accident. To the extent that DL experienced any health problems at all as a result of the accident, they were of low

or minimal severity. Even so, following a purported initial examination on July 7, 2020, All Accidents and LaRocca billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that DL presented with problems of moderate to high severity.

(x)    On August 1, 2020, an Insured named MS was involved in an automobile accident. The contemporaneous police report indicated that MS's vehicle was drivable following the accident. The police report further indicated that MS was not injured as a result of the accident. In keeping with the fact that MS was not seriously injured as a result of the accident, MS was not transported to any hospital emergency department following the accident. To the extent that MS experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination on August 19, 2020, LaRocca Auto and LaRocca billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that MS presented with problems of moderate to high severity.

100.    These are only representative examples. In the claims for initial examinations identified in Exhibits "1" – "4", Defendants routinely falsely represented that the Insureds presented with problems of moderate or moderate to high severity in order to: (i) create a false basis for their charges for the putative examinations under CPT codes 99203 and 99204, because examinations billable under CPT codes 99203 and 99204 are reimbursable at a higher rate than examinations involving presenting problems of low severity, minimal severity, or no severity; and (ii) create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

**b.    Misrepresentation Regarding the Amount of Time Spent on the Initial Examinations**

101.    What is more, in the claims for initial examinations that are identified in Exhibits "1" – "4", Defendants routinely misrepresented and exaggerated the amount of time that the examining physician or chiropractor spent performing the examinations.

102.    As set forth in Exhibits "1" – "4", Defendants virtually always billed for the putative initial examinations using CPT codes 99203 and 99204, and thereby represented that the

physician or chiropractor who purported to conduct the examinations spent at least 30 or 45 minutes performing the putative examinations.

103.    In fact, in most of the claims for initial examinations identified in Exhibits "1" – "4", neither LaRocca, Torres-Ruiz, nor any other chiropractor or physician associated with the LaRocca Practices ever spent more than 15 minutes – let alone 30 or 45 minutes – of time purporting to perform the examinations.

104.    For instance, and in keeping with the fact that the initial examinations in the claims identified in Exhibits "1" – "4" did not take more than 15 minutes to perform, the physicians and chiropractors who purported to perform the examinations at the LaRocca Practices used a template in purporting to conduct the initial examinations.

105.    The template that the physicians and chiropractors used in purporting to conduct the initial examinations set forth a limited range of examination parameters, including brief patient interviews and limited examinations of the Insureds' musculoskeletal systems.

106.    These brief patient interviews and limited examinations did not require LaRocca, Torres-Ruiz, or any other physician or chiropractor associated with the LaRocca Practices to spend more than 15 minutes of time on the examinations, to the extent that they were even provided at all.

107.    In the claims for initial examinations that are identified in Exhibits "1" – "4", the Defendants routinely misrepresented the amount of time that was spent conducting the initial examinations because lengthier examinations that are billable under CPT codes 99203 and 99204 are reimbursable at higher rates than examinations that take less time to perform.

c.      **Misrepresentation Regarding the Extent of Decision Making**

108.    Furthermore, in the claims for initial examinations identified in Exhibits "1" – "4,

when Defendants billed GEICO for the purported examinations using CPT code 99203, they

falsely represented that the chiropractors, physicians, or other health care providers who purported

to conduct the examinations engaged in some legitimate, low complexity medical decision-making

in connection with the examinations.

109.    When the LaRocca Practices and LaRocca billed GEICO for the purported

examinations using CPT code 99204, they falsely represented that the chiropractors, physicians, or

other health care providers who purported to conduct the examinations engaged in some legitimate,

moderate complexity medical decision-making in connection with the examinations.

110.    In actuality, the purported initial examinations did not involve any legitimate

medical decision-making at all.

111.    Rather, in the claims for initial examinations identified in Exhibits "1" – "4: (i) the

initial examinations did not involve the retrieval, review, or analysis of any meaningful amount of

medical records, diagnostic tests, or other information; (ii) there was no risk of significant

complications or morbidity – much less mortality – from the Insureds' minor soft-tissue injury

complaints, to the extent that they ever had any complaints arising from automobile accidents at

all; and (iii) Defendants and  their associates did not consider any significant number of diagnoses

or treatment options for Insureds during the initial examinations, and instead provided a

substantially similar, pre-determined sprain/strain or similar soft tissue injury "diagnoses" for

every Insured, regardless of their true individual circumstances or presentation.

112.    For example:

(i)      On March 28, 2018, an Insured named OM was involved in an automobile accident.
The contemporaneous police report indicated that OM's vehicle was drivable

following the accident. The police report further indicated that OM was not injured as a result of the accident. In keeping with the fact that OM was not seriously injured as a result of the accident, OM was not transported to any hospital emergency department following the accident. To the extent that OM experienced any health problems at all as a result of the accident, they were of low or minimal severity. On April 13, 2018, LaRocca purported to provide an initial examination to OM at LaRocca Auto. To the extent that LaRocca performed the examination in the first instance, LaRocca did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, LaRocca did not consider any significant number of diagnoses or management options in connection with the examination. Instead, LaRocca and LaRocca Auto provided OM with substantially the same, false, list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither OM's presenting problems, nor the treatment plan provided to OM by LaRocca and LaRocca Auto presented any risk of significant complications, morbidity, or mortality. To the contrary, OM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by LaRocca and LaRocca Auto consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to OM. Even so LaRocca and LaRocca Auto billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that LaRocca engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ii)    On May 3, 2019, an Insured named LK was involved in an automobile accident. The contemporaneous police report indicated that LK was not injured as a result of the accident. The police report further indicated that LK was not transported to any hospital emergency department following the accident. On June 17, 2019, Torres-Ruiz purported to provide an initial examination to LK at LaRocca Chiropractic Injury. To the extent that Torres-Ruiz performed the examination in the first instance, Torres-Ruiz did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Torres-Ruiz did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Torres-Ruiz, LaRocca, and LaRocca Chiropractic Injury provided LK with substantially the same, false, list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither LK's presenting problems, nor the treatment plan provided to LK by Torres-Ruiz, LaRocca, and LaRocca Chiropractic Injury presented any risk of significant complications, morbidity, or mortality. To the contrary, LK did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Torres-Ruiz, LaRocca, and LaRocca Chiropractic Injury consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to LK. Even so, Torres-Ruiz, LaRocca, and LaRocca Chiropractic Injury billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that

Torres-Ruiz engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iii)     On June 14, 2019, an Insured named WR was involved in an automobile accident. The contemporaneous police report indicated that WR sustained possible injures as a result of the accident. The police report further stated that WR was not transported to any hospital emergency department following the accident. To the extent that WR experienced any health problems at all as a result of the accident, they were of low or minimal severity. On July 3, 2019, Torres-Ruiz purported to provide an initial examination to WR at LaRocca Auto. To the extent that Torres-Ruiz performed the examination in the first instance, Torres-Ruiz did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Torres-Ruiz did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Torres-Ruiz, LaRocca, and LaRocca Auto provided WR with substantially the same, false, list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither WR's presenting problems, nor the treatment plan provided to WR by Torres-Ruiz, LaRocca, and LaRocca Auto presented any risk of significant complications, morbidity, or mortality. To the contrary, WR did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Torres-Ruiz, LaRocca, and LaRocca Auto consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to WR. Even so LaRocca and LaRocca Auto billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Torres-Ruiz engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iv)     On July 6, 2019, an Insured named BB was involved in an automobile accident. The contemporaneous police report indicated that BB was not injured as a result of the accident. The police report further indicated that BB was not transported to any hospital emergency department following the accident. To the extent that BB experienced any health problems at all as a result of the accident, they were of low or minimal severity. On July 11, 2019, LaRocca purported to provide an initial examination to BB at All Accidents. To the extent that LaRocca performed the examination in the first instance, LaRocca did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, LaRocca did not consider any significant number of diagnoses or management options in connection with the examination. Instead, LaRocca and All Accidents provided BB with substantially the same, false, list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither BB's presenting problems, nor the treatment plan provided to BB by LaRocca and All Accidents presented any risk of significant complications, morbidity, or mortality. To the contrary, BB did not need any significant treatment at all as a result of the accident, and the treatment plan provided by LaRocca and All Accidents consisted of medically unnecessary

27

chiropractic and physical therapy services, which did not pose a significant risk to BB. Even so, LaRocca and All Accidents billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that LaRocca engaged in some legitimate, low complexity medical decision-making during the purported examination.

(v)     On October 26, 2019, an Insured named JA was involved in an automobile accident. The contemporaneous police report indicated that JA was not injured as a result of the accident. The police report further indicated that JA was not transported to any hospital emergency department following the accident. To the extent that JA experienced any health problems at all as a result of the accident, they were of low or minimal severity. On November 7, 2019, a chiropractor named Michael Major ("Major") purported to provide an initial examination to JA at LaRocca Chiropractic Injury. To the extent that Major performed the examination in the first instance, Major did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Major did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Major, LaRocca, and LaRocca Chiropractic Injury provided JA with substantially the same, false, list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither JA's presenting problems, nor the treatment plan provided to JA by Major, LaRocca, and LaRocca Chiropractic Injury presented any risk of significant complications, morbidity, or mortality. To the contrary, JA did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Major, LaRocca, and LaRocca Chiropractic Injury consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to JA. Even so, LaRocca and LaRocca Chiropractic Injury billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Major engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vi)    On January 4, 2020, an Insured named CW was involved in an automobile accident. The contemporaneous police report indicated that CW's vehicle was drivable following the accident. The police report further indicated that CW was not injured as a result of the accident. In keeping with the fact that CW was not seriously injured as a result of the accident, CW was not transported to any hospital emergency department after the accident. To the extent that CW experienced any health problems at all as a result of the accident, they were of low or minimal severity. On February 3, 2020, Torres-Ruiz purported to provide an initial examination to CW at LaRocca Chiropractic Injury. To the extent that Torres-Ruiz performed the examination in the first instance, Torres-Ruiz did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Torres-Ruiz did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Torres-Ruiz, LaRocca, and LaRocca Chiropractic Injury provided CW with substantially the same, false, list of soft

28

tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither CW's presenting problems, nor the treatment plan provided to CW by Torres-Ruiz, LaRocca, and LaRocca Chiropractic Injury presented any risk of significant complications, morbidity, or mortality. To the contrary, CW did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Torres-Ruiz, LaRocca, and LaRocca Chiropractic Injury consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to CW. Even so, LaRocca and LaRocca Chiropractic Injury billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Torres-Ruiz engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(vii)     On January 14, 2020, an Insured named SZ was involved in an automobile accident. The contemporaneous police report indicated that SZ's vehicle was drivable following the accident. The police report further indicated that SZ was not injured as a result of the accident. In keeping with the fact that SZ was not seriously injured as a result of the accident, SZ was not transported to any hospital emergency department following the accident. To the extent that SZ experienced any health problems at all as a result of the accident, they were of low or minimal severity. On February 3, 2020, Torres-Ruiz purported to provide an initial examination to SZ at LaRocca Chiropractic Injury. To the extent that Torres-Ruiz performed the examination in the first instance, Torres-Ruiz did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Torres-Ruiz did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Torres-Ruiz, LaRocca, and LaRocca Chiropractic Injury provided SZ with substantially the same, false, list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither SZ's presenting problems, nor the treatment plan provided to SZ by Torres-Ruiz, LaRocca, and LaRocca Chiropractic Injury presented any risk of significant complications, morbidity, or mortality. To the contrary, SZ did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Torres-Ruiz, LaRocca, and LaRocca Chiropractic Injury consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to SZ. Even so, LaRocca and LaRocca Chiropractic Injury billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Torres-Ruiz engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(viii)    On May 24, 2020, an Insured named ML was involved in an automobile accident. The contemporaneous police report indicated that ML's vehicle drivable following the accident. The police report further indicated that ML was not injured as a result of the accident. In keeping with the fact that ML was not seriously injured as a result of the accident, ML was not transported to any hospital emergency department. To the extent that ML experienced any health problems at all as a result

of the accident, they were of low or minimal severity. On July 7, 2020, Torres-Ruiz purported to provide an initial examination to ML at All Accidents. To the extent that Torres-Ruiz performed the examination in the first instance, Torres-Ruiz did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Torres-Ruiz did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Torres-Ruiz, LaRocca, and All Accidents provided ML with substantially the same, false, list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither ML's presenting problems, nor the treatment plan provided to ML by Torres-Ruiz, LaRocca, and All Accidents presented any risk of significant complications, morbidity, or mortality. To the contrary, ML did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Torres-Ruiz, LaRocca, and All Accidents consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to ML. Even so, LaRocca and All Accidents billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Torres-Ruiz engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(ix)     On August 1, 2020, an Insured named MS was involved in an automobile accident. The contemporaneous police report indicated that MS's vehicle was drivable following the accident. The police report further indicated that MS was not injured as a result of the accident. In keeping with the fact that MS was not seriously injured as a result of the accident, MS was not transported to any hospital emergency department following the accident. To the extent that MS experienced any health problems at all as a result of the accident, they were of low or minimal severity. On August 19, 2020, Torres-Ruiz purported to provide an initial examination to MS at LaRocca Auto. To the extent that Torres-Ruiz performed the examination in the first instance, Torres-Ruiz did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Torres-Ruiz did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Torres-Ruiz, LaRocca, and LaRocca Auto provided MS with substantially the same, false, list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither MS's presenting problems, nor the treatment plan provided to MS by Torres-Ruiz, LaRocca, and LaRocca Auto presented any risk of significant complications, morbidity, or mortality. To the contrary, MS did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Torres-Ruiz, LaRocca, and LaRocca Auto consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to MS. Even so, LaRocca and LaRocca Auto billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Torres-Ruiz engaged in some legitimate, moderate complexity medical decision-making during the purported examination

(x)     On August 12, 2020, an Insured named SD was involved in an automobile accident. The contemporaneous police report indicated that SD's vehicle was drivable following the accident. The police report further indicated that SD was not injured as a result of the accident. In keeping with the fact that SD was not seriously injured as a result of the accident, SD was not transported to any hospital emergency department. To the extent that SD experienced any health problems at all as a result of the accident, they were of low or minimal severity. On August 13, 2020, LaRocca purported to provide an initial examination to SD at All Accidents. To the extent that LaRocca performed the examination in the first instance, LaRocca did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, LaRocca did not consider any significant number of diagnoses or management options in connection with the examination. Instead, LaRocca and All Accidents provided SD with substantially the same, false, list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither SD's presenting problems, nor the treatment plan provided to SD by LaRocca and All Accidents presented any risk of significant complications, morbidity, or mortality. To the contrary, SD did not need any significant treatment at all as a result of the accident, and the treatment plan provided by LaRocca and All Accidents consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to SD. Even so, LaRocca and All Accidents billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that LaRocca engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xi)    On August 12, 2020, an Insured named KS was involved in an automobile accident. The contemporaneous police report indicated that KS's vehicle was drivable following the accident. The police report further indicated that KS was not injured as a result of the accident. In keeping with the fact that KS was not seriously injured as a result of the accident, KS was not transported to any hospital emergency department. To the extent that KS experienced any health problems at all as a result of the accident, they were of low or minimal severity. On August 13, 2020, LaRocca purported to provide an initial examination to KS at All Accidents. To the extent that LaRocca performed the examination in the first instance, LaRocca did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, LaRocca did not consider any significant number of diagnoses or management options in connection with the examination. Instead LaRocca and All Accidents provided KS with substantially the same, false, list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither KS's presenting problems, nor the treatment plan provided to KS by LaRocca and All Accidents presented any risk of significant complications, morbidity, or mortality. To the contrary, KS did not need any significant treatment at all as a result of the accident, and the treatment plan provided by LaRocca and All Accidents consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to KS. Even so, LaRocca and All

Accidents billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that LaRocca engaged in some legitimate, low complexity medical decision-making during the purported examination

(xii)   On November 1, 2020, an Insured named AE was involved in an automobile accident. The contemporaneous police report indicated that AE was not injured as a result of the accident. The police report further indicated that AE was not transported to any hospital emergency department following the accident. To the extent that AE experienced any health problems at all as a result of the accident, they were of low or minimal severity. On March 4, 2020, Torres-Ruiz purported to provide an initial examination to AE at LaRocca Chiropractic Injury. To the extent that Torres-Ruiz performed the examination in the first instance, Torres-Ruiz did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Torres-Ruiz did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Torres-Ruiz, LaRocca, and LaRocca Chiropractic Injury provided AE with substantially the same, false, list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither AE's presenting problems, nor the treatment plan provided to AE by Torres-Ruiz, LaRocca, and LaRocca Chiropractic Injury presented any risk of significant complications, morbidity, or mortality. To the contrary, AE did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Torres-Ruiz, LaRocca, and LaRocca Chiropractic Injury consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to AE. Even so, LaRocca and LaRocca Chiropractic Injury billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Torres-Ruiz engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xiii)  On December 13, 2020, an Insured named FT was involved in an automobile accident. The contemporaneous police report indicated that FT's vehicle was drivable following the accident. The police report further indicated that Ft was not injured as a result of the accident. In keeping with the fact that FT was not seriously injured as a result of the accident, FT was not transported to any hospital emergency department. To the extent that FT experienced any health problems at all as a result of the accident, they were of low or minimal severity. On December 17, 2020, Andrew Eliason, D.C. ("Eliason") purported to provide an initial examination to FT at All Accidents. To the extent that Eliason performed the examination in the first instance, Eliason did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Eliason did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Eliason, LaRocca, and All Accidents provided FT with substantially the same, false, list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither FT's presenting problems, nor the treatment plan

provided to FT by Eliason, LaRocca, and All Accidents presented any risk of significant complications, morbidity, or mortality. To the contrary, FT did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Eliason, LaRocca, and All Accidents consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to FT. Even so, LaRocca and All Accidents billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Eliason engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xiv)   On February 5, 2021, an Insured named AG was involved in an automobile accident. The contemporaneous police report indicated that AG's vehicle was drivable following the accident. The police report further indicated that AG was not injured as a result of the accident. In keeping with the fact that AL was not seriously injured as a result of the accident, AG was not transported to any hospital emergency department following the accident. To the extent that AG experienced any health problems at all as a result of the accident, they were of low or minimal severity. On March 23, 2021, LaRocca purported to provide an initial examination to AG at LaRocca Auto. To the extent that LaRocca performed the examination in the first instance, LaRocca did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, LaRocca did not consider any significant number of diagnoses or management options in connection with the examination. Instead, LaRocca and LaRocca Auto provided AG with substantially the same, false, list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither AG's presenting problems, nor the treatment plan provided to AG by LaRocca and LaRocca Auto presented any risk of significant complications, morbidity, or mortality. To the contrary, AG did not need any significant treatment at all as a result of the accident, and the treatment plan provided by LaRocca and LaRocca Auto consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to AG. Even so LaRocca and LaRocca Auto billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that LaRocca engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xv)   On April 10, 2021, an Insured named PJ was involved in an automobile accident. The contemporaneous police report indicated that PJ's vehicle was drivable following the accident. The police report further indicated that PJ was not transported to any hospital emergency department following the accident. To the extent that PJ experienced any health problems at all as a result of the accident, they were of low or minimal severity. On May 3, 2021, Major purported to provide an initial examination to PJ at LaRocca Chiropractic Injury. To the extent that Major performed the examination in the first instance, Major did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Major did not consider any significant number of diagnoses or management options in connection with the

examination. Instead, Major, LaRocca, and LaRocca Chiropractic Injury provided PJ with substantially the same, false, list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither PJ's presenting problems, nor the treatment plan provided to PJ by Major, LaRocca, and LaRocca Chiropractic Injury presented any risk of significant complications, morbidity, or mortality. To the contrary, PJ did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Major, LaRocca, and LaRocca Chiropractic Injury consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to PJ. Even so, LaRocca and LaRocca Chiropractic Injury billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Major engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xvi)   On September 10, 2021, an Insured named LE was involved in an automobile accident. The contemporaneous police report indicated that LE's vehicle was drivable following the accident. The police report further indicated that LE was not injured as a result of the accident. In keeping with the fact that LE was not seriously injured as a result of the accident, LE was not transported to any hospital emergency department following the accident. To the extent that LE experienced any health problems at all as a result of the accident, they were of low or minimal severity. On September 20, 2021, LaRocca purported to provide an initial examination to LE at LaRocca Chiropractic. To the extent that LaRocca performed the examination in the first instance, LaRocca did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, LaRocca did not consider any significant number of diagnoses or management options in connection with the examination. Instead, LaRocca and LaRocca Chiropractic provided LE with substantially the same, false, list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither LE's presenting problems, nor the treatment plan provided to LE by LaRocca and LaRocca Chiropractic presented any risk of significant complications, morbidity, or mortality. To the contrary, LE did not need any significant treatment at all as a result of the accident, and the treatment plan provided by LaRocca and LaRocca Chiropractic consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to LE. Even so, LaRocca and LaRocca Chiropractic billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that LaRocca engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xvii)  On October 11, 2021, an Insured named AD was involved in an automobile accident. The contemporaneous police report indicated that AD has "possible" injuries, but was not transported to any hospital emergency department following the accident. To the extent that AD experienced any health problems at all as a result of the accident, they were of low or minimal severity. On October 13, 2021, LaRocca purported to provide an initial examination to AD at LaRocca Chiropractic. To the extent that LaRocca performed the examination in the first

instance, LaRocca did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, LaRocca did not consider any significant number of diagnoses or management options in connection with the examination. Instead, LaRocca and LaRocca Chiropractic provided AD with substantially the same, false, list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither AD's presenting problems, nor the treatment plan provided to AD by LaRocca and LaRocca Chiropractic presented any risk of significant complications, morbidity, or mortality. To the contrary, AD did not need any significant treatment at all as a result of the accident, and the treatment plan provided by LaRocca and LaRocca Chiropractic consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to AD. Even so, LaRocca and LaRocca Chiropractic billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that LaRocca engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xviii)  On October 14, 2021, an Insured named AL was involved in an automobile accident. The contemporaneous police report indicated that AL's vehicle was drivable following the accident. The police report further indicated that AL was not injured as a result of the accident. In keeping with the fact that AL was not seriously injured as a result of the accident, AL was not transported to any hospital emergency department after the accident. To the extent that AL experienced any health problems at all as a result of the accident, they were of low or minimal severity. On November 1, 2021, LaRocca purported to provide an initial examination to AL at LaRocca Chiropractic. To the extent that LaRocca performed the examination in the first instance, LaRocca did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, LaRocca did not consider any significant number of diagnoses or management options in connection with the examination. Instead, LaRocca and LaRocca Chiropractic provided AL with substantially the same, false, list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither AL's presenting problems, nor the treatment plan provided to AL by LaRocca and LaRocca Chiropractic presented any risk of significant complications, morbidity, or mortality. To the contrary, AL did not need any significant treatment at all as a result of the accident, and the treatment plan provided by LaRocca and LaRocca Chiropractic consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to AL. Even so, LaRocca and LaRocca Chiropractic billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that LaRocca engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xix)  On November 18, 2021, an Insured named AL was involved in an automobile accident. The contemporaneous police report indicated that AL's vehicle was drivable following the accident. The police report further indicated that AL was not

injured as a result of the accident. In keeping with the fact that AL was not seriously injured as a result of the accident, AL was not transported to any hospital emergency department following the accident. To the extent that AL experienced any health problems at all as a result of the accident, they were of low or minimal severity. On December 4, 2021, LaRocca purported to provide an initial examination to AL at LaRocca Auto. To the extent that LaRocca performed the examination in the first instance, LaRocca did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, LaRocca did not consider any significant number of diagnoses or management options in connection with the examination. Instead, LaRocca and LaRocca Auto provided AL with substantially the same, false, list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither AL's presenting problems, nor the treatment plan provided to AL by LaRocca and LaRocca Auto presented any risk of significant complications, morbidity, or mortality. To the contrary, AL did not need any significant treatment at all as a result of the accident, and the treatment plan provided by LaRocca and LaRocca Auto consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to AL. Even so LaRocca and LaRocca Auto billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that LaRocca engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xx) On December 25, 2021, an Insured named BH was involved in an automobile accident. The contemporaneous police report indicated that BH's vehicle was drivable following the accident. The police report further indicated that BH was not transported to any hospital emergency department following the accident. To the extent that BH experienced any health problems at all as a result of the accident, they were of low or minimal severity. On January 24, 2021, LaRocca purported to provide an initial examination to BH at LaRocca Chiropractic. To the extent that LaRocca performed the examination in the first instance, LaRocca did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, LaRocca did not consider any significant number of diagnoses or management options in connection with the examination. Instead, LaRocca and LaRocca Chiropractic provided BH with substantially the same, false, list of soft tissue injury "diagnoses" that they provided to virtually every other Insured, Furthermore, neither BH's presenting problems, nor the treatment plan provided to BH by LaRocca and LaRocca Chiropractic presented any risk of significant complications, morbidity, or mortality. To the contrary, BH did not need any significant treatment at all as a result of the accident, and the treatment plan provided by LaRocca and LaRocca Chiropractic consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to BH. Even so, LaRocca and LaRocca Chiropractic billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that LaRocca engaged in some legitimate, low complexity medical decision-making during the purported examination.

36

113.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

114.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

115.    As set forth above, in the claims identified in Exhibit "1" – "4", almost all of the Insureds who purportedly received treatment at the LaRocca Practices were involved in relatively minor accidents.

116.    It is improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibits "1" – "4" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

117.    It likewise is improbable that two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibits "1" – "4" would present for an initial examination with substantially identical symptoms, and receive substantially identical diagnoses, on or about the <u>exact same date</u> after their underlying automobile accident.

118.    It is even more improbable – to the point of impossibility – that this would occur with great frequency within a cohort of patients treating at individual health care practices such as the LaRocca Practices.

119.    Even so, and in keeping with the fact that these putative "diagnoses" were pre-determined and false, the LaRocca Practices, LaRocca, and their associates working at their direction, frequently issued substantially similar, false "diagnoses", on or about the same date, to two or more Insureds who had been involved in the same underlying accident, and recommended

37

a substantially similar course of medically unnecessary "treatment" to the Insureds, despite the fact that they were differently situated.

120.    For example:

(i)    On May 14, 2019, two Insureds – MP and EP – were involved in the same automobile accident. Thereafter, MP and EP presented – incredibly – on the exact same date, May 15, 2019, for initial examinations at LaRocca Chiropractic Injury. MP and EP were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that MP and EP suffered any injuries at all in their accident, the injuries were different. Even so, LaRocca Chiropractic Injury, LaRocca, and Major provided MP and EP with substantially similar "diagnoses", and recommended a substantially similar course of medically unnecessary treatment for both of them.

(ii)    On June 14, 2019, three Insureds – WR, TM, and BP – were involved in the same automobile accident. Thereafter, WR, TM, and BP presented – incredibly – on the same exact date, June 25, 2019, to LaRocca Auto for initial examinations. WR, TM, and BP were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that WR, TM, and BP suffered any injuries at all in their accident, the injuries were different. Even so, LaRocca Auto and LaRocca provided WR, TM, and BP with substantially similar "diagnoses", and recommended a substantially similar course of medically unnecessary treatment for all three of them.

(iii)    On December 27, 2019, two Insureds named TS and GS – were involved in the same automobile accident. Thereafter, TS and GS presented – incredibly – on the exact same date, February 19, 2020, for initial examinations. TS and GS were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that TS and GS suffered any injuries at all in their accident, the injuries were different. Even so, LaRocca Auto and LaRocca provided TS and GS with substantially similar "diagnoses", and recommended a substantially similar course of medically unnecessary treatment for both of them.

(iv)    On January 4, 2020, two Insureds – CW and CW – were involved in the same automobile accident. Thereafter, CW and CW presented – incredibly – on the exact same date, January 13, 2020, to LaRocca Chiropractic Injury for initial examinations. CW and CW were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that CW and CW suffered any injuries at all in their accident, the injuries were different. Even so, LaRocca Chiropractic Injury, LaRocca, and Major provided CW and CW with substantially similar "diagnoses", and recommended a substantially similar course of medically unnecessary treatment for both of them.

(v)     On January 25, 2020, four Insureds – AP, AP, SP, and BP – were involved in the same automobile accident. Thereafter, AP, AP, SP, and BP presented – incredibly – on the same exact date, January 30, 2020, to LaRocca Chiropractic for initial examinations. AP, AP, SP, and BP were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that AP, AP, SP, and BP suffered any injuries at all in their accident, the injuries were different. Even so, LaRocca Chiropractic and LaRocca provided AP, AP, SP, and BP with substantially similar "diagnoses", and recommended a substantially similar course of medically unnecessary treatment for all four of them.

(vi)    On August 12, 2020, two Insureds – KS and SD – were involved in the same automobile accident. Thereafter, KS and SD presented – incredibly – on the exact same date, August 13, 2020, to All Accidents for initial examinations. KS and SD were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that KS and SD suffered any injuries at all in their accident, the injuries were different. Even so, All Accidents and LaRocca provided KS and SD with substantially similar "diagnoses", and recommended a substantially similar course of medically unnecessary treatment for both of them.

(vii)   On December 29, 2020, two Insureds – DH and SM – were involved in the same automobile accident. Thereafter, DH and SM presented – incredibly – on the exact same date, December 31, 2020, to LaRocca Auto for initial examinations. DH and SM were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that DH and SM suffered any injuries at all in their accident, the injuries were different. Even so, LaRocca Auto and LaRocca provided DH and SM with substantially similar "diagnoses", and recommended a substantially similar course of medically unnecessary treatment for both of them.

(viii)  On January 23, 2021, two Insureds – BM and PW – were involved in the same automobile accident. Thereafter, BM and PW presented – incredibly – on the same exact date, January 27, 2021, to LaRocca Chiropractic for initial examinations. BM and PW were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that BM and PW suffered any injuries at all in their accident, the injuries were different. Even so, LaRocca Chiropractic and LaRocca provided BM and PW with substantially similar "diagnoses", and recommended a substantially similar course of medically unnecessary treatment for both of them.

(ix)    On March 9, 2021, two Insureds – NA and WB – were involved in the same automobile accident. Thereafter, NA and WB presented – incredibly – on the exact same date, March 12, 2021, for initial examinations at LaRocca Chiropractic Injury, NA and WB were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that NA and WB suffered any injuries at all in their accident, the injuries were different. Even so,

39

LaRocca Chiropractic Injury, LaRocca, and Major provided NA and WB with substantially similar "diagnoses", and recommended a substantially similar course of medically unnecessary treatment for both of them.

(x)     On March 24, 2021, two Insureds – FG and DJ – were involved in the same automobile accident. Thereafter, FG and DJ presented – incredibly – on the same exact date, March 29, 2020, to All Accidents for initial examinations. FG and DJ were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that FG and DL suffered any injuries at all in their accident, the injuries were different. Even so, All Accidents and LaRocca provided FG and DL with substantially similar "diagnoses", and recommended a substantially similar course of medically unnecessary treatment for both of them.

(xi)    On June 21, 2020, two Insureds – LJ and NJ – were involved in the same automobile accident. Thereafter, LJ and NJ presented – incredibly –on the exact same date, June 26, 2020, to LaRocca Chiropractic Injury for initial examinations. LJ and NJ were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that LJ and NJ suffered any injuries at all in their accident, the injuries were different. Even so, LaRocca Chiropractic Injury, LaRocca, and Major provided LJ and NJ with substantially similar "diagnoses", and recommended a substantially similar course of medically unnecessary treatment for both of them.

(xii)   On October 12, 2021, four insureds – AM, ER, LR, and LS – were involved in the same automobile accident. Thereafter, on October 13, 2021, AM and LS presented to LaRocca Auto for initial examinations. Then, one day later, on October 14, 2021, ER and LR too presented to LaRocca Auto for initial examinations. AM, ER, LR, and LS were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that AM, ER, LR, and LS suffered any injuries at all in their accident, the injuries were different. Even so, LaRocca Auto and LaRocca provided AP AM, ER, LR, and LS with substantially similar "diagnoses", and recommended a substantially similar course of medically unnecessary treatment for all four of them.

(xiii)  On January 3, 2022, two Insureds – JW and MC – were involved in the same automobile accident. Thereafter, JW and MC presented – incredibly – on the same exact date, January 6, 2022, to LaRocca Chiropractic for initial examinations. JW and MC were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that JW and MC suffered any injuries at all in their accident, the injuries were different. Even so, LaRocca Chiropractic and LaRocca provided JW and MC with substantially similar "diagnoses", and recommended a substantially similar course of medically unnecessary treatment for both of them.

(xiv)   On February 15, 2022, two Insureds – OD and MJ – were involved in the same automobile accident. Thereafter, on February 24, 2022, OD presented to All Accidents for an initial examination. Then, on March 4, 2022, MJ too presented to All Accidents for an initial examination. OD and MJ were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that OD and MJ suffered any injuries at all in their accident, the injuries were different. Even so, All Accidents and LaRocca, and provided OD and MJ with substantially similar "diagnoses" and recommended a substantially similar course of medically unnecessary treatment for both of them.

(xv)    On April 24, 2022, two Insureds – RM and MM – were involved in the same automobile accident. Thereafter, RM and MM presented – incredibly – on the same exact date, April 28, 2022, to All Accidents for initial examinations. RM and MM were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that RM and MM suffered any injuries at all in their accident, the injuries were different. Even so, All Accidents and LaRocca provided RM and MM with substantially similar "diagnoses", and recommended a substantially similar course of medically unnecessary treatment for both of them.

121.    The false "diagnoses" contained within the initial examination reports were included to give the false impression that the initial examinations entailed some legitimate medical decision-making, to create a false basis for the charges under CPT codes 99203 and 99204, and to create a false justification for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

122.    In the claims for initial examinations identified in Exhibits "1" – "4", Defendants routinely fraudulently misrepresented that the examinations were lawfully provided and eligible for PIP reimbursement, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially identical, false "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative examinations misrepresented the nature, extent, and results of the examinations; and

41

(iii)   the LaRocca Practices never were eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as they were operated in violation of Florida law.

123.   In this context, LaRocca – who at all relevant times purported to own and supervise the LaRocca Practices – did not, and could not have, legitimately supervised the business activities of the LaRocca Practices.

124.   Had LaRocca actually supervised the business activities of the LaRocca Practices he would have noted – among other things – that the LaRocca Practices' billing routinely fraudulently misrepresented that the putative initial examinations were legitimately and lawfully performed and were eligible for reimbursement, when in fact they were not.

125.   LaRocca failed to do so, because he never actually supervised the business activities of the LaRocca Practices.

## 2.   The Fraudulent and Unlawful Charges for Follow-Up Examinations at the LaRocca Practices

126.   The LaRocca Practices and LaRocca also typically purported to subject the Insureds in the claims identified in Exhibits "1" – "4" to fraudulent follow-up examinations during the course of Defendants' fraudulent treatment and billing protocol.

127.   The follow-up examinations purportedly were performed by LaRocca and various other health care practitioners who were employed by or associated with LaRocca and the LaRocca Practices and who worked at their direction, including Ruiz.

128.   As set forth in Exhibits "1" – "4", Defendants then billed the follow-up examinations to GEICO under: (i) CPT code 99213, typically resulting in charges of between $145.00 and $179.48; and (ii) CPT code 99214, typically resulting in a charge of between $215.00 and $259.00.

129.    Pursuant to the CPT Assistant, at all relevant times the use of CPT code 99213 to bill for a follow-up examination represented – among other things – that: (i) the patient presented with problems of low to moderate severity; and (ii) the physician performed at least two of the following three components during the examination: (a) took an "expanded problem focused" patient history; (b) conducted an "expanded problem focused physical examination"; and (c) engaged in medical decision-making of "low complexity".

130.    Pursuant to the CPT Assistant, at all relevant times the use of CPT code 99214 to bill for a follow-up examination represented – among other things – that: (i) the patient presented with problems of moderate to high severity; and (ii) the physician performed at least two of the following three components during the examination: (a) took a "detailed" patient history; (b) conducted a "detailed" physical examination; and (c) engaged in medical decision-making of "moderate complexity".

131.    In the claims for follow-up examinations identified in Exhibits "1" – "4", the charges for the follow-up examinations were fraudulent in that they misrepresented the LaRocca Practices' eligibility to collect PIP Benefits in the first instance.

132.    In fact, and as set forth herein, the LaRocca Practices never were eligible to collect PIP Benefits, inasmuch as they were operated in violation of the licensing and operating requirements set forth in the Clinic Act.

133.    As set forth below, the charges for the follow-up examinations identified in Exhibits "1" – "4" also were fraudulent in that they misrepresented the nature, extent, results, and medical necessity of the follow-up examinations.

a.      **Misrepresentation Regarding the Severity of the Insureds' Presenting Problems**

134.    To the extent that the Insureds in the claims identified in Exhibits "1" – "4" suffered any injuries at all in their automobile accidents, the injuries almost always were minor soft tissue injuries such as sprains and strains, which were of low or minimal severity, even at their onset.

135.    Minor soft tissue injuries such as strains and sprains virtually always resolve after a short course of conservative treatment or no treatment at all. By the time the Insureds in the claims identified in Exhibits "1" – "4" presented for their putative follow-up examinations – typically weeks or even months after their minor accidents – the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents, or else their presenting problems were minimal.

136.    Even so, in the claims for the follow-up examinations identified in Exhibits "1" – "4", Defendants made the following misrepresentations:

(i)      When billing GEICO for putative follow-up examinations using CPT code 99213 in the claims identified in Exhibits "1" – "4", Defendants falsely represented that the Insureds presented with problems of low to moderate severity, when in fact the Insureds' problems were minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any continuing problems at all at the time of the examinations.

(ii)     When billing GEICO for putative follow-up examinations using CPT code 99214 in the claims identified in Exhibits "1" – "4", Defendants falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds' problems were minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any continuing problems at all at the time of the examinations.

137.    For example:

(i)      On January 18, 2020, an Insured named LG was involved in an automobile accident. The contemporaneous police report indicated that LG's vehicle was drivable following the accident. The police report further indicated that LG was not injured as a result of the accident. In keeping with the fact that LG was not seriously injured as a result of the accident, LG was not transported to any hospital emergency department following the accident. To the extent that LG experienced any health problems at all as a result of the accident, they were of low or minimal

severity at the outset and improved over time. Even so, following a purported follow-up examination of LG on July 28, 2022 – nearly six months after the accident – LaRocca and All Accidents billed for the follow-up examination using CPT code 99213, and thereby falsely represented that LG presented with problems of low to moderate severity.

(ii)     On June 19, 2020, an Insured named LD was involved in an automobile accident. The contemporaneous police report indicated that LD was not injured as a result of the accident. The police report further indicated that LD was not transported to any hospital emergency department following the accident. To the extent that LD experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset and improved over time. Even so, following a purported follow-up examination of LD on January 18, 2021 – seven months after the accident – LaRocca and All Accidents billed for the follow-up examination using CPT code 99214, and thereby falsely represented that LD presented with problems of moderate to high severity.

(iii)    On July 14, 2020, an Insured named PA was involved in an automobile accident. The contemporaneous police report indicated that PA was not injured as a result of the accident. The police report further indicated that PA was not transported to any hospital emergency room following the accident. To the extent that PA experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset and improved over time. Even so, following a purported follow-up examination of PA on October 29, 2020 – more than three months after the accident – LaRocca and LaRocca Chiropractic Injury billed for the follow-up examination using CPT code 99214, and thereby falsely represented that PA presented with problems of moderate to high severity.

(iv)     On July 18, 2020, an Insured named RP was involved in an automobile accident. The contemporaneous police report indicated that RP was not injured as a result of the accident. The police report further indicated that RP was not transported to any hospital emergency department following the accident. To the extent that RP experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset and improved over time. Even so, following a purported follow-up examination of RP on August 18, 2020 – one month after the accident – LaRocca and LaRocca Chiropractic Injury billed for the follow-up examination using CPT code 99214, and thereby falsely represented that RP presented with problems of moderate to high severity.

(v)      On August 1, 2020, an Insured named MS was involved in an automobile accident. The contemporaneous police report indicated that MS's vehicle was drivable following the accident. The police report further indicated that MS was not injured as a result of the accident. In keeping with the fact that MS was not seriously injured as a result of the accident, MS was not transported to any hospital emergency department following the accident. To the extent that MS experienced any health problems at all as a result of the accident, they were of low or minimal severity at

the outset and improved over time. Even so, following a purported follow-up examination of MS on October 16, 2020 – over ten weeks after the accident – LaRocca and LaRocca Auto billed for the follow-up examination using CPT code 99213, and thereby falsely represented that MS presented with problems of low to moderate severity.

138.  These are only representative examples. In virtually all of the claims for follow-up examinations identified in Exhibits "1" – "4", Defendants falsely represented that Insureds presented with problems of low to moderate or moderate to high severity, when in fact the Insured either did not have any genuine presenting problems at all as the result of their automobile accidents at the time of the follow-up examinations – which often were many months after the accidents – or else their presenting problems were minimal.

139.  In the claims for follow-up examinations identified in Exhibits "1" – "4", Defendants routinely falsely represented that the Insureds presented with problems of low to moderate or moderate to high severity in order to create a false basis for their charges for the putative examinations under CPT codes 99213 or 99214, because examinations billable under CPT codes 99213 or 99214 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity.

**b.    Misrepresentations Regarding the Amount of Time Spent on Follow-Up Examinations**

140.  Moreover, in the claims for follow-up examinations identified in Exhibits "1" – "4" that were billed under CPT codes 99213 and 99214, the LaRocca Practices and LaRocca misrepresented the amount of time that was spent on the follow-up examinations.

141.  The use of CPT code 99213 to bill for a follow-up examination typically represents that the treating provider who performed the examination spent at least 20 minutes of time performing the examination.

142.     The use of CPT code 99214 to bill for a follow-up examination typically represents that the treating provider who performed the examination spent at least 30 minutes of time performing the examination.

143.     As set forth in Exhibits "1" – "4", the LaRocca Practices and LaRocca submitted virtually all of their billing for follow-up examinations under CPT codes 99213 and 99214, and thereby falsely represented that the chiropractors, physicians or other health care practitioners who purported to perform the follow-up examinations spent at least 20 minutes (when billing under CPT code 99213) or 30 minutes (when billing under CPT code 99214) of time performing the examinations.

144.     In fact, in the claims for follow-up examinations identified in Exhibits "1" – "4", the follow-up examinations did not take more than 10 minutes to perform, to the extent that the examinations actually were performed in the first instance.

145.     For instance, and in keeping with the fact that the follow-up examinations allegedly provided through the LaRocca Practices and LaRocca did not take more than 10 minutes to perform, Defendants used a template in purporting to conduct the follow-up examinations.

146.     The template that Defendants used in purporting to conduct the follow-up examinations set forth a very limited range of examination parameters, consisting of brief patient interviews and very brief examinations of the Insureds' musculoskeletal systems.

147.     These brief interviews and examinations did not require LaRocca, or any other chiropractor, physician, or other health care practitioner associated with the Defendants, to spend 20 minutes of face-to-face time with the Insureds or their families.

148.     In the claims for follow-up examinations identified in Exhibits "1" – "4", Defendants falsely represented that the examinations required at least 20 or even 30 minutes to

perform in order to create a false basis for their charges under CPT codes 99213 and 99214, because examinations billable under CPT codes 99213 and 99214 are reimbursable at a higher rate than examinations that require less time to perform.

**c.      Misrepresentations Regarding the Results of the Follow-Up Examinations**

149.    What is more, in the claims for follow-up examinations identified in Exhibits "1" – "4", neither LaRocca, nor any other chiropractor or physician associated with the LaRocca Practices, ever took any legitimate patient histories, conducted any legitimate physical examinations, or engaged in any legitimate medical decision-making at all.

150.    Rather, following the purported follow-up examinations, LaRocca, or other practitioners working at Defendants' direction, simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations; and either (ii) referred the Insureds for even more medically unnecessary chiropractic and physical therapy services, despite the fact that the Insureds purportedly already had received extensive chiropractic  and physical therapy services that supposedly had not been successful in resolving their purported pain symptoms; or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

151.    The fake "follow-up examinations" that Defendants purported to provide to the Insureds in the claims identified in Exhibits "1" – "4" therefore were medically useless, and played no legitimate role in the treatment or care of the Insureds, because the putative "results" of the examinations were prearranged to comport with the medically unnecessary treatment plan that was pre-determined for each Insured from the moment they walked into the LaRocca Practices' offices.

152.    In the claims for follow-up examinations identified in Exhibits "1" – "4", Defendants routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-identical, false "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)   the LaRocca Practices never were eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as they were operated in violation of Florida law.

153.    In this context, LaRocca, who at all relevant times purported to own the LaRocca Practices, did not, and could not have, legitimately supervised the business activities of the LaRocca Practices.

154.    Had LaRocca actually supervised the business activities of the LaRocca Practices, he would have noted – among other things – that the LaRocca Practices routinely fraudulently misrepresented that the putative follow-up examinations were legitimately and lawfully performed, and eligible for PIP reimbursement.

155.    LaRocca failed to do so, because he never actually supervised the business activities of the LaRocca Practices.

**3.      The Fraudulent "Emergency Medical Condition" Diagnoses**

156.    Moreover, in keeping with the fact that Defendants routinely inserted false "diagnoses" in their initial and follow-up examination reports in order to create the false impression that the examinations required some legitimate medical decision-making, the Defendants – or the physicians and other health care practitioners who worked at their direction – regularly appended a false "Emergency Medical Condition" determination to their examination reports. This, despite the fact that the Insureds were not, and could not have been, legitimately suffering from any emergency medical conditions as the result of their minor accidents.

157.    The Defendants routinely caused these false "diagnoses" to be included in their examination reports in order to create the false impression that the examinations required some legitimate medical decision-making, to create a false justification for the other Fraudulent Services that the Defendants purported to provide to the Insureds, and to increase the Insureds' PIP reimbursement limits for health care services from $2,500.00 to $10,000.00, thereby enabling the Defendants to submit the maximum amount of fraudulent and unlawful PIP charges per Insured. See Fla. Stat. § 627.736.

158.    However, to the extent that the Insureds in the claims identified in Exhibits "1" – "4" ever had any genuine medical problems at all as the result of their minor automobile accidents, the problems virtually always were limited to minimally-severe sprains or strains of the back, neck, or extremities, which did not legitimately constitute any kind of "emergency medical conditions".

159.    For example:

(i)     On March 8, 2019, an Insured named NP was involved in an automobile accident. The contemporaneous police report indicated that NP was not injured as a result of the accident. The police report further indicated that NP was not transported to any hospital emergency department following the accident. To the extent that NP experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, and did not legitimately constitute any kind of "emergency medical condition". Even so, following a purported initial examination of NP at LaRocca Chiropractic Injury on April 30, 2019, Torres-Ruiz – at LaRocca's direction – falsely reported that NP's injuries constituted an "emergency medical condition."

(ii)    On June 14, 2019, an Insured named WR was involved in an automobile accident. The contemporaneous police report indicated that WR sustained possible injures as a result of the accident. The police report further stated that WR was not transported to any hospital emergency department following the accident. To the extent that WR experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, and did not legitimately constitute any kind of "emergency medical condition". Even so, following a purported initial examination of WR at LaRocca Auto on July 3, 2019, Torres-Ruiz – at LaRocca's direction – falsely reported that WR's injuries constituted an "emergency medical condition."

(iii)    On August 15, 2019, an Insured named BT was involved in an automobile accident. The contemporaneous police report indicated that BT's vehicle was drivable following the accident. The police report further indicated that BT was not injured as a result of the accident. In keeping with the fact that BT was not seriously injured as a result of the accident, BT was not transported to any hospital emergency department following the accident. To the extent that BT experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, and did not legitimately constitute any kind of "emergency medical condition". Even so, following a purported initial examination of BT at LaRocca Auto on August 28, 2019, Torres-Ruiz – at LaRocca's direction – falsely reported that BT's injuries constituted an "emergency medical condition."

(iv)    On December 27, 2019, an Insured named JD was involved in an automobile accident. The contemporaneous police report indicated that JD was not injured as a result of the accident. The police report further indicated that JD was not transported to any hospital emergency department following the accident. To the extent that JD experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, and did not legitimately constitute any kind of "emergency medical condition". Even so, following a purported initial examination of JD at LaRocca Chiropractic Injury on January 8, 2020, Torres-Ruiz – at LaRocca's direction – falsely reported that JD's injuries constituted an "emergency medical condition."

(v)    On January 14, 2020, an Insured named SZ was involved in an automobile accident. The contemporaneous police report indicated that SZ's vehicle was drivable following the accident. The police report further indicated that SZ was not injured as a result of the accident. In keeping with the fact that SZ was not seriously injured as a result of the accident, SZ was not transported to any hospital emergency department following the accident. To the extent that SZ experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, and did not legitimately constitute any kind of "emergency medical condition". Even so, following a purported initial examination of SZ at LaRocca Chiropractic Injury on January 28, 2020, Torres-Ruiz – at LaRocca's direction – falsely reported that SZ's injuries constituted an "emergency medical condition."

(vi)    On January 18, 2020, an Insured named LG was involved in an automobile accident. The contemporaneous police report indicated that LG's vehicle was drivable following the accident. The police report further indicated that LG was not injured as a result of the accident. In keeping with the fact that LG was not seriously injured as a result of the accident, LG was not transported to any hospital emergency department following the accident. To the extent that LG experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, and did not legitimately constitute any kind of "emergency medical condition". Even so, following a purported follow-up examination of LG at All Accidents on January 27, 2020, Torres-Ruiz – at

51

LaRocca's direction – falsely reported that LG's injuries constituted an "emergency medical condition."

(vii)    On May 24, 2020, an Insured named ML was involved in an automobile accident. The contemporaneous police report indicated that ML's vehicle drivable following the accident. The police report further indicated that ML was not injured as a result of the accident. In keeping with the fact that ML was not seriously injured as a result of the accident, ML was not transported to any hospital emergency department. To the extent that ML experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, and did not legitimately constitute any kind of "emergency medical condition". Even so, following a purported follow-up examination of ML at All Accidents on July 7, 2020, Torres-Ruiz – at LaRocca's direction – falsely reported that ML's injuries constituted an "emergency medical condition."

(viii)   On July 14, 2020, an Insured named PA was involved in an automobile accident. The contemporaneous police report indicated that PA was not injured as a result of the accident. The police report further indicated that PA was not transported to any hospital emergency room following the accident. To the extent that PA experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, and did not legitimately constitute any kind of "emergency medical condition". Even so, following a purported follow-up examination of PA at LaRocca Chiropractic Injury on October 29, 2020, Torres-Ruiz – at LaRocca's direction – falsely reported that PA's injuries constituted an "emergency medical condition."

(ix)     On August 1, 2020, an Insured named MS was involved in an automobile accident. The contemporaneous police report indicated that MS's vehicle was drivable following the accident. The police report further indicated that MS was not injured as a result of the accident. In keeping with the fact that MS was not seriously injured as a result of the accident, MS was not transported to any hospital emergency department following the accident. To the extent that MS experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, and did not legitimately constitute any kind of "emergency medical condition". Even so, following a purported initial examination of MS at LaRocca Auto on August 19, 2020, Torres-Ruiz – at LaRocca's direction – falsely reported that MS's injuries constituted an "emergency medical condition."

(x)      On November 1, 2020, an Insured named AE was involved in an automobile accident. The contemporaneous police report indicated that AE was not injured as a result of the accident. The police report further indicated that AE was not transported to any hospital emergency department following the accident. To the extent that AE experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, and did not legitimately constitute any kind of "emergency medical condition". Even so, following a purported follow-up examination of AE at LaRocca Chiropractic Injury

on November 10, 2020, Torres-Ruiz – at LaRocca's direction – falsely reported that AE's injuries constituted an "emergency medical condition."

(xi)     On December 13, 2020, an Insured named FT was involved in an automobile accident. The contemporaneous police report indicated that FT's vehicle was drivable following the accident. The police report further indicated that Ft was not injured as a result of the accident. In keeping with the fact that FT was not seriously injured as a result of the accident, FT was not transported to any hospital emergency department. To the extent that FT experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, and did not legitimately constitute any kind of "emergency medical condition". Even so, following a purported follow-up examination of FT at All Accidents on December 21, 2020, Torres-Ruiz – at LaRocca's direction – falsely reported that FT's injuries constituted an "emergency medical condition."

(xii)    On December 25, 2021, an Insured named BH was involved in an automobile accident. The contemporaneous police report indicated that BH's vehicle was drivable following the accident. The police report further indicated that BH was not transported to any hospital emergency department following the accident. To the extent that BH experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, and did not legitimately constitute any kind of "emergency medical condition". Even so, following a purported follow-up examination of BH at LaRocca Chiropractic on January 24, 2022, Torres-Ruiz – at LaRocca's direction – falsely reported that BH's injuries constituted an "emergency medical condition."

(xiii)   On September 10, 2021, an Insured named LE was involved in an automobile accident. The contemporaneous police report indicated that LE's vehicle was drivable following the accident. The police report further indicated that LE was not injured as a result of the accident. In keeping with the fact that LE was not seriously injured as a result of the accident, LE was not transported to any hospital emergency department following the accident. To the extent that LE experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, and did not legitimately constitute any kind of "emergency medical condition". Even so, following a purported follow-up examination of LE at LaRocca Chiropractic on September 20, 2021, Torres-Ruiz – at LaRocca's direction – falsely reported that LE's injuries constituted an "emergency medical condition."

(xiv)    On October 11, 2021, an Insured named AD was involved in an automobile accident. The contemporaneous police report indicated that AD has "possible" injuries, but was not transported to any hospital emergency department following the accident. To the extent that AD experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, and did not legitimately constitute any kind of "emergency medical condition". Even so, following a purported follow-up examination at LaRocca

Chiropractic on October 13, 2021, Torres-Ruiz – at LaRocca's direction – falsely reported that AD's injuries constituted an "emergency medical condition."

(xv)   On October 14, 2021, an Insured named AL was involved in an automobile accident. The contemporaneous police report indicated that AL's vehicle was drivable following the accident. The police report further indicated that AL was not injured as a result of the accident. In keeping with the fact that AL was not seriously injured as a result of the accident, AL was not transported to any hospital emergency department after the accident. To the extent that AL experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, and did not legitimately constitute any kind of "emergency medical condition". Even so, following a purported follow-up examination at LaRocca Chiropractic on November 1, 2021, Torres-Ruiz – at LaRocca's direction – falsely reported that AL's injuries constituted an "emergency medical condition."

(xvi)   On February 2, 2022, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that MC's vehicle was drivable following the accident. The police report further indicated that MC was not injured as a result of the accident. In keeping with the fact that MC was not seriously injured as a result of the accident, MC was not transported to any hospital emergency department. To the extent that MC experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, and did not legitimately constitute any kind of "emergency medical condition". Even so, following a purported follow-up examination of MC at All Accidents on February 8, 2022, Torres-Ruiz – at LaRocca's direction – falsely reported that MC's injuries constituted an "emergency medical condition."

(xvii)   On February 15, 2022, an Insured named OD was involved in an automobile accident. The contemporaneous police report indicated that OD's vehicle was drivable following the accident. The police report further indicated that OD was not injured as a result of the accident. In keeping with the fact that OD was not seriously injured as a result of the accident, OD was not transported to any hospital emergency department following the accident. To the extent that OD experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, and did not legitimately constitute any kind of "emergency medical condition". Even so, following a purported follow-up examination of OD at All Accidents on March 29, 2022, Torres-Ruiz – at LaRocca's direction – falsely reported that OD's injuries constituted an "emergency medical condition."

(xviii)   On March 29, 2022, an Insured named CR was involved in an automobile accident. The contemporaneous police report indicated that CR was not injured as a result of the accident. The police report further indicated that CR was not seriously injured as a result of the accident, CR was not transported to any hospital emergency department following the accident. To the extent that CR experienced any health

54

problems at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, and did not legitimately constitute any kind of "emergency medical condition". Even so, following a purported follow-up examination of CR at All Accidents on April 5, 2022, Torres-Ruiz – at LaRocca's direction – falsely reported that CR's injuries constituted an "emergency medical condition."

(xix)   On April 16, 2022, an Insured named AB was involved in an automobile accident. The contemporaneous police report indicated that AB was not injured as a result of the accident. The police report further indicated that AB was not transported to any hospital emergency department. To the extent that AB experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, and did not legitimately constitute any kind of "emergency medical condition". Even so, following a purported follow-up examination of AB at All Accidents on April 21, 2022, Torres-Ruiz – at LaRocca's direction – falsely reported that AB's injuries constituted an "emergency medical condition."

(xx)   Natasha Koller On January 24, 2023, an Insured named NK was involved in an automobile accident. The contemporaneous police report indicated that NK's vehicle was drivable following the accident. The police report further indicated that NK was not transported to any hospital emergency department following the accident. To the extent that NK experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, and did not legitimately constitute any kind of "emergency medical condition". Even so, following a purported initial examination of NK at LaRocca Auto on March 27, 2023, Torres-Ruiz – at LaRocca's direction – falsely reported that NK's injuries constituted an "emergency medical condition."

160.    These are only representative examples. In the claims for examinations that are identified in Exhibits "1" – "4", the LaRocca Practices, LaRocca, and the health care practitioners acting at their direction and their behalf, including Torres-Ruiz, routinely falsely diagnosed patients with an "emergency medical condition" so as to increase the amount of fraudulent and unlawful PIP billing that Defendants could submit to GEICO and other insurers.

**4.   Defendants' Fraudulent Charges for Chiropractic and Physical Therapy Services**

161.    In addition to their other Fraudulent Services, Defendants virtually always purported to subject each of the Insureds in the claims identified in Exhibits "1" – "4" to medically unnecessary physical therapy and chiropractic treatment and billed GEICO for the purported

physical therapy and/or chiropractic services under CPT codes 97012, 97110, 97140, 98940, 98941, 98943, and Health Care Common Procedure Coding System ("HCCPCS") code S8948.

162.    Like Defendants' charges for the other Fraudulent Services, the charges for the purported physical therapy and chiropractic services were fraudulent in that they misrepresented the LaRocca Practices' eligibility to collect PIP Benefits in the first instance.

163.    In fact, and as set forth herein, the LaRocca Practices never were eligible to collect PIP Benefits, inasmuch as they were operated in violation of Florida law.

164.    The charges for the physical therapy and chiropractic services also were fraudulent in that they misrepresented the nature and medical necessity of the services.

165.    In a legitimate clinical setting, each individual patient's physical therapy and/or chiropractic treatment schedule, and the specific treatment modalities that will be used, must be tailored to the specific patient's circumstances, symptomatology, and presentation.

166.    In a legitimate clinical setting, the nature of, extent of, and schedule for physical therapy is constantly adjusted for each individual patient based on each patient's treatment progress, as assessed during each patient's follow-up examinations and on an ongoing basis as they receive the physical therapy or chiropractic treatment.

167.    In keeping with the fact that the purported physical therapy and chiropractic services that were billed through the LaRocca Practices to GEICO were not medically necessary, Defendants did not tailor the chiropractic and physical therapy services they purported to provide to each Insured's individual circumstances and presentation.

168.    There are a large number of individual types of physical therapy and chiropractic services that potentially can be provided to a patient, depending on the patient's individual symptomatology and needs.

169.     However, the LaRocca Practices and LaRocca virtually always purported to provide the same handful of chiropractic and physical therapy "treatments" to virtually every Insured in the claims identified in Exhibits "1" – "4", on substantially the same schedule, without regard for the Insureds' individual circumstances.

170.     Specifically, Defendants routinely purported to provide the Insureds in the claims identified in Exhibits "1" – "4" with two to three months of chiropractic and physical therapy services, virtually always consisting of chiropractic adjustments, mechanical traction, manual therapy, therapeutic activities, and low level laser treatment. This, despite the fact that the Insureds were differently situated, and could not possibly all have required a substantially-similar course of physical therapy treatment.

171.     In keeping with the fact that Defendants purported to provide these physical therapy and chiropractic services pursuant to pre-determined fraudulent protocols, the LaRocca Practices and LaRocca routinely purported to begin performing these services prior to the Insured having first tried a more conservative course of rest, ice, compression, and – if applicable – elevation of the affected body part.

172.     In legitimate clinical setting, when a patient presents with a soft tissue injury such as a sprain or strain arising from an automobile accident, the initial standard of care is conservative treatment comprised of rest, ice, compression, and – if applicable – elevation of the affected body part.

173.     It generally is inappropriate to begin administering physical therapy and chiropractic to a patient with a soft tissue injury in the immediate aftermath of the injury, before the patient has first tried a more conservative course of rest, compression, and – if applicable – elevation of the affected body part.

174.    Even so, in the claims identified in Exhibits "1" – "4", Defendants routinely directed Insureds to immediately begin a course of physical therapy and chiropractic often within a few days of their accident, before the Insureds had first tried a more conservative course of rest, compression, and – if applicable – elevation of the affected body part.

175.    Defendants routinely directed Insureds to immediately begin a course of physical therapy and chiropractic often within days of their accidents, or even on the same day of their accidents, because it was predetermined that they would provide their putative physical therapy and chiropractic services to any Insured who presented to them, regardless of medical necessity.

176.    What is more, and in further keeping with the fact that at the LaRocca Practices, the nature and extent of the physical therapy and chiropractic treatment that each Insured purportedly received was pre-determined, and had no legitimate connection to the Insureds' individual circumstances, two or more Insureds who had been involved in the same automobile accident oftentimes would not only begin their physical therapy and chiropractic treatment with the LaRocca Practices on the same dates, but incredibly, they would often also complete their purported treatment on the exact same dates.

177.    It is improbable that any two or more Insureds involved in any one of the automobile accidents in the claims identified in Exhibits "1" – "4" would suddenly have their symptoms resolve and be ready for discharge from treatment on the exact same date, months after their common motor vehicle accident.

178.    It is even more improbable, to the point of impossibility, that this kind of pattern would recur with great frequency among the cohort of patients treated by a related group of health care providers such as the LaRocca Practices.

179.    Even so, this occurred frequently at the LaRocca Practices, for example:

(i)     On December 27, 2019, two Insureds – GS and TS – were involved in the same automobile accident. Thereafter, both GS and TS presented to LaRocca Auto for their first day of therapy and chiropractic services on the exact same date, January 10, 2020. GS and TS were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that GS and TS suffered any injuries at all in their accident, the injuries were different, and resolved at different rates. Even so, and in keeping with the fact that the physical therapy and chiropractic treatments that LaRocca Auto and LaRocca provided were pre-determined and medically unnecessary, GS and TS both presented at LaRocca Auto on at least ten of the <u>exact</u> same dates over a six-week period where they received substantially similar physical therapy and chiropractic treatment on most of those dates.

(ii)     On May 23, 2020, two Insureds – BU and MW – were involved in the same automobile accident. Thereafter, both BU and MW presented to All Accidents for their first day of therapy and chiropractic services on the exact same date, May 26, 2020. BU and MW were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that BU and MW suffered any injuries at all in their accident, the injuries were different, and resolved at different rates. Even so, and in keeping with the fact that the physical therapy and chiropractic treatment that All Accidents and LaRocca provided were pre-determined and medically unnecessary, BU and MW both presented at All Accidents on at least ten of the <u>exact</u> same dates over a four-week period where they received substantially similar physical therapy and chiropractic treatment on most of those dates. Moreover, All Accidents and LaRocca stopped purporting to provide physical therapy and chiropractic services to BU and MW on the exact same day, June 25, 2020. This, despite the fact that any injuries they actually did experience in their accident would have resolved differently over the four weeks when they purportedly were treating at All Accidents.

(iii)     On August 23, 2020, two Insureds – TM and RM – were involved in the same automobile accident. Thereafter, both TM and RM presented to LaRocca Chiro for their first day of therapy and chiropractic services on the exact same date, August 24, 2020. TM and RM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that TM and RM suffered any injuries at all in their accident, the injuries were different, and resolved at different rates. Even so, and in keeping with the fact that the physical therapy and chiropractic treatment that LaRocca Chiro and LaRocca provided were pre-determined and medically unnecessary, TM and RM both presented at LaRocca Chiro on at least ten of the <u>exact</u> same dates over a six-week period where they received substantially similar physical therapy and chiropractic treatment on most of those dates. Moreover, LaRocca Chiro and LaRocca stopped purporting to provide physical therapy and chiropractic services to TM and RM on the exact same day, November 30, 2020. This, despite the fact that any injuries they actually did experience in their accident

would have resolved differently over the four weeks when they purportedly were treating at LaRocca Chiro.

(iv)     On January 23, 2021, two Insureds – BM and PW – were involved in the same automobile accident. Thereafter, both BM and PW presented to LaRocca Chiro for their first day of therapy and chiropractic services on the exact same date, January 27, 2021. BM and PW were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that BM and PW suffered any injuries at all in their accident, the injuries were different, and resolved at different rates. Even so, and in keeping with the fact that the physical therapy and chiropractic treatment that LaRocca Chiro and LaRocca provided were pre-determined and medically unnecessary, BM and PW both presented at LaRocca Chiro on at least ten of the exact same dates over a six-week period where they received substantially similar physical therapy and chiropractic treatment on most of those dates.

(v)      On March 24, 2021, two Insureds – FG and DJ – were involved in the same automobile accident. Thereafter, both FG and DJ presented to All Accidents for their first day of therapy and chiropractic services on the exact same date, March 29, 2021. FG and DJ were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that FG and DJ suffered any injuries at all in their accident, the injuries were different, and resolved at different rates. Even so, and in keeping with the fact that the physical therapy and chiropractic treatment that All Accidents and LaRocca provided were pre-determined and medically unnecessary, FG and DJ both presented at All Accidents on at least ten of the exact same dates over a six-week period where they received substantially similar physical therapy and chiropractic treatment on most of those dates.

(vi)     On November 12, 2021, two Insureds – AV and TV – were involved in the same automobile accident. Thereafter, both AV and TV presented to LaRocca Auto for their first day of therapy and chiropractic services on the exact same date, December 2, 2021. AV and TV were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AV and TV suffered any injuries at all in their accident, the injuries were different, and resolved at different rates. Even so, and in keeping with the fact that the physical therapy and chiropractic treatment that LaRocca Auto, LaRocca, and Hunt provided were pre-determined and medically unnecessary, AV and TV both presented at LaRocca Auto on at least ten of the exact same dates over a six-week period where they received substantially similar physical therapy and chiropractic treatment on most of those dates.

(vii)    On January 3, 2022, two Insureds – JC and DL – were involved in the same automobile accident. Thereafter, both JC and DL presented to LaRocca Chiro for their first day of therapy and chiropractic services on the exact same date, January

11, 2022. JC and DL were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that JC and DL suffered any injuries at all in their accident, the injuries were different, and resolved at different rates. Even so, and in keeping with the fact that the physical therapy and chiropractic treatment that LaRocca Chiro and LaRocca provided were pre-determined and medically unnecessary, JC and DL both presented at LaRocca Chiro on at least ten of the <u>exact</u> same dates over a four-week period where they received substantially similar physical therapy and chiropractic treatment on most of those dates. Moreover, LaRocca Chiro and LaRocca stopped purporting to provide physical therapy and chiropractic services to JC and DL on the exact same day, February 3, 2022. This, despite the fact that any injuries they actually did experience in their accident would have resolved differently over the four weeks when they purportedly were treating at LaRocca Chiro.

(viii)   On January 19, 2022, two Insureds – CN and JN – were involved in the same automobile accident. Thereafter, both CN and JN presented to LaRocca Chiro for their first day of therapy and chiropractic services on the exact same date, January 26, 2022. CN and JN were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that CN and JN suffered any injuries at all in their accident, the injuries were different, and resolved at different rates. Even so, and in keeping with the fact that the physical therapy and chiropractic treatment that LaRocca Chiro and LaRocca provided were pre-determined and medically unnecessary, CN and JN both presented at LaRocca Chiro on at least eight of the <u>exact</u> same dates over an eight-week period where they received substantially similar physical therapy and chiropractic treatment on most of those dates.

(ix)   On February 3, 2022, two Insureds – VM and JR – were involved in the same automobile accident. Thereafter, both VM and JR presented to All Accidents for their first day of therapy and chiropractic services on the exact same date, February 17, 2022. VM and JR were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that VM and JR suffered any injuries at all in their accident, the injuries were different, and resolved at different rates. Even so, and in keeping with the fact that the physical therapy and chiropractic treatment that All Accidents and LaRocca provided were pre-determined and medically unnecessary, VM and JR both presented at All Accidents on at least ten of the <u>exact</u> same dates over a six-week period where they received substantially similar physical therapy and chiropractic treatment on most of those dates. Moreover, All Accidents and LaRocca stopped purporting to provide physical therapy and chiropractic services to VM and JR on the exact same day, April 28, 2022. This, despite the fact that any injuries they actually did experience in their accident would have resolved differently over the six weeks when they purportedly were treating at All Accidents.

(x)     On May 2, 2022, two Insureds – DB and HC – were involved in the same automobile accident. Thereafter, both DB and HC presented to LaRocca Chiro for their first day of therapy and chiropractic services on the exact same date, January 26, 2022. DB and HC were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that DB and HC suffered any injuries at all in their accident, the injuries were different, and resolved at different rates. Even so, and in keeping with the fact that the physical therapy and chiropractic treatment that LaRocca Chiro and LaRocca provided were pre-determined and medically unnecessary, DB and HC both presented at LaRocca Chiro on at least eight of the exact same dates over a four-week period where they received substantially similar physical therapy and chiropractic treatment on most of those dates. Moreover, LaRocca Chiro and LaRocca stopped purporting to provide physical therapy and chiropractic services to DB and HC on the exact same day, June 7, 2022. This, despite the fact that any injuries they actually did experience in their accident would have resolved differently over the four weeks when they purportedly were treating at LaRocca Chiro.

180.    These are only representative examples. In the claims identified in Exhibits "1" – "4", Defendants often purported to provide a substantially identical course of medically unnecessary physical therapy and chiropractic treatment to two or more Insureds who appeared for these "treatments" on the exact same dates, and then in many instances would also incredibly "complete" their purported treatment on the exact same date.

181.    Defendants' fraudulent scheme enabled the LaRocca Practices and LaRocca to bill for weeks or even months of medically unnecessary chiropractic and physical therapy services per Insured, without regard for the Insureds' true circumstances or presentation.

**5.      Defendants' Fraudulent Charges for HME**

182.    As part of their fraudulent scheme, Defendants purported to prescribe many Insureds with HME.

183.    In particular, Defendants purported to prescribe many Insureds with transcutaneous electrical nerve stimulation ("TENS") units, and cervical traction ("CT") units – that were then provided and billed through the LaRocca Practices.

184.     As set forth in Exhibits "1" – "4", Defendants billed GEICO for the TENS units under HCPCS code E0730, typically resulting in a charge of $741.00 for each putative TENS unit.

185.     Also, as set forth in Exhibits "1" – "4", Defendants billed GEICO for the CT units using HCPCS code E0849, typically resulting in a charge of $1,050.00 for each putative CT unit.

186.     In the claims for HME identified in Exhibits "1" – "4", the charges for the HME were fraudulent and unlawful in that they misrepresented the Defendants' eligibility to collect PIP Benefits in the first instance.

187.     In fact, Defendants never were eligible to collect PIP Benefits, inasmuch as they operated in violation of the Florida law.

188.     As set forth below, Defendants' charges for the HME identified in Exhibits "1" – "4" also were fraudulent in that they misrepresented the medical necessity of the putative HME.

a.       **The Fraudulent Charges for Medically Unnecessary TENS Units**

189.     In a legitimate clinical setting, electrostimulation treatment of the kind provided by TENS units may be prescribed and used to treat pain. The device transmits electrical signals to the brain that compete with pain signals from the brain, resulting in a reduction in the patient's perception of pain.

190.     However, there is a dearth of quality scientific evidence supporting the use of the kind of therapeutic electrical stimulation provided by a TENS unit when administered contemporaneously with a regular course of conservative treatment such as chiropractic and/or physical therapy.

191.     Even so, in the claims identified in Exhibits "1" – "4", the Defendants – in order to increase the volume of fraudulent billing they could submit to GEICO and other insurers – routinely provided medically unwarranted TENS units to Insureds despite the fact that the Insureds

suffered only minor soft-tissue injuries, to the limited extent they suffered any injuries at all, that did not require the use of a TENS unit in the first instance.

**b.    The Fraudulent Charges for the Medically Unnecessary CT Units**

192.    The prescription and provision of a CT unit is duplicative and medically unnecessary when provided contemporaneously with a regular course of in-office cervical traction services.

193.    Even so, Defendants routinely provided CT units to Insureds despite the fact that the Insureds were contemporaneously receiving – or had received – a course of in-office cervical traction services, rendering the home-use CT unit duplicative and medically unnecessary.

194.    In the claims for CT units identified in Exhibits "1" – "4", Defendants routinely purported to provide medically unnecessary CT units to Insureds despite the fact that the CT units were provided to Insureds who were contemporaneously receiving a course of in-office cervical traction services, in order to increase the volume of fraudulent billing they could submit to GEICO and other insurers.

**III.    The Fraudulent Claims the Defendants Submitted or Caused to be Submitted to GEICO**

195.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of bills and treatment reports through the LaRocca Practices to GEICO, containing thousands of individual charges, seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

196.    The claims that the Defendants submitted or caused to be submitted to GEICO were false and misleading in the following, material respects:

(i)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by Defendants uniformly misrepresented to GEICO that Defendants were in compliance with Florida law and therefore were eligible to collect PIP Benefits in

the first instance. In fact, Defendants were never in compliance with Florida law and never were eligible to collect PIP Benefits.

(ii)     The HCFA-1500 forms and treatment reports submitted or caused to be submitted by Defendants uniformly misrepresented to GEICO that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement. In fact, the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement.

(iii)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed to financially enrich Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iv)    The HCFA-1500 forms and treatment reports submitted by and on behalf of the Defendants frequently misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the identities of the individuals who performed or directly supervised the Fraudulent Services.

## IV.    Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

197.    Defendants were legally and ethically obligated to act honestly and with integrity in connection with their performance of the Fraudulent Services and their submission of charges to GEICO. Even so, Defendants knowingly misrepresented and concealed facts related to the LaRocca Practices in an effort to prevent discovery that Defendants operated in pervasive violation of Florida law, and to prevent discovery that the Fraudulent Services were medically unnecessary, in many cases illusory, and ineligible for PIP reimbursement.

198.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and acts of concealment described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $10,750,000.00.

199.     GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it commenced this action.

### FIRST CAUSE OF ACTION
**Against LaRocca Chiropractic**
**(Declaratory Judgment -- 28 U.S.C. §§ 2201 and 2202)**

200.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-199, above.

201.     There is an actual case in controversy between GEICO and LaRocca Chiropractic regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

202.     LaRocca Chiropractic has no right to receive payment for any pending bills submitted to GEICO because it was unlawfully operated in violation of Florida law.

203.     LaRocca Chiropractic has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not lawfully provided or billed to GEICO.

204.     LaRocca Chiropractic has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

205.     LaRocca Chiropractic has no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services never were provided in the first instance.

206.   LaRocca Chiropractic has no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO, and because it misrepresented the identity of the persons who performed or directly supervised the Fraudulent Services.

207.   Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that LaRocca Chiropractic has no right to receive payment for any pending bills submitted to GEICO.

<u>SECOND CAUSE OF ACTION</u>
**Against LaRocca**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

208.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-199, above.

209.   LaRocca Chiropractic is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

210.   LaRocca knowingly has conducted and/or participated, directly or indirectly, in the conduct of LaRocca Chiropractic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over five years seeking payments that LaRocca Chiropractic was not eligible to receive under the No-Fault Law because: (i) LaRocca Chiropractic unlawfully was operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise

benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (vi) the bills for the Fraudulent Services misrepresented the identity of the persons who performed or directly supervised the Fraudulent Services.

211.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

212.   LaRocca Chiropractic's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which LaRocca operated LaRocca Chiropractic, inasmuch as LaRocca Chiropractic was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for LaRocca Chiropractic to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through LaRocca Chiropractic to the present day.

213.   LaRocca Chiropractic is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by LaRocca Chiropractic in pursuit of inherently unlawful goals -- namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

68

214.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $8,800,000.00 pursuant to the fraudulent bills submitted through LaRocca Chiropractic.

215.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
### Against LaRocca Chiropractic and LaRocca
### (Under Fla. Stat. 501.201 et. seq.)

216.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-199, above.

217.    LaRocca Chiropractic and LaRocca are actively engaged in trade and commerce in the State of Florida.

218.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

219.    LaRocca Chiropractic and LaRocca engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally-obtain PIP Benefits from GEICO.

220.    The bills and supporting documents submitted by LaRocca Chiropractic and LaRocca to GEICO in connection with the Fraudulent Services were fraudulent in that they misrepresented: (i) LaRocca Chiropractic's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

221.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of LaRocca Chiropractic and LaRocca has been materially injurious to GEICO and its Insureds.

222.    The conduct of LaRocca Chiropractic and LaRocca was the actual and proximate cause of the damages sustained by GEICO.

223.    LaRocca Chiropractic and LaRocca's unfair and deceptive acts have caused GEICO to sustain damages of at least $8,800,000.00.

224.    By reason of LaRocca Chiropractic and LaRocca's conduct, GEICO is also entitled to recover costs, and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

**FOURTH CAUSE OF ACTION**
**Against LaRocca Chiropractic and LaRocca**
**(Common Law Fraud)**

225.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-199, above.

226.    LaRocca Chiropractic and LaRocca intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills through LaRocca Chiropractic for the Fraudulent Services.

227.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that LaRocca Chiropractic was in compliance with Florida law, and eligible to collect PIP Benefits in the first instance, when in fact LaRocca Chiropractic never was in compliance with Florida law or eligible to collect PIP Benefits; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided,

and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed; and (v) in many claims, misrepresentations regarding the identity of the persons who performed or directly supervised the Fraudulent Services.

228.    LaRocca Chiropractic and LaRocca intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through LaRocca Chiropractic that were not reimbursable.

229.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $8,800,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the LaRocca Chiropractic and LaRocca through LaRocca Chiropractic.

230.    LaRocca Chiropractic and LaRocca's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

231.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### Against LaRocca Chiropractic and LaRocca
### (Unjust Enrichment)

232.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-199, above.

233.    As set forth above, LaRocca Chiropractic and LaRocca have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

234.    When GEICO paid the bills and charges submitted or caused to be submitted by LaRocca Chiropractic and LaRocca through LaRocca Chiropractic, it reasonably believed that it was legally obligated to make such payments based on LaRocca Chiropractic and LaRocca's improper, unlawful, and/or unjust acts.

235.    LaRocca Chiropractic and LaRocca have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that LaRocca Chiropractic and LaRocca voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

236.    LaRocca Chiropractic and LaRocca's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

237.    By reason of the above, LaRocca Chiropractic and LaRocca have been unjustly enriched in an amount to be determined at trial, but in no event less than $8,800,000.00.

### SIXTH CAUSE OF ACTION
**Against All Accidents**
**(Declaratory Judgment -- 28 U.S.C. §§ 2201 and 2202)**

238.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-199, above.

239.    There is an actual case in controversy between GEICO and All Accidents regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

240.    All Accidents has no right to receive payment for any pending bills submitted to GEICO because it was unlawfully operated in violation of Florida law.

241.    All Accidents has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not lawfully provided or billed to GEICO.

242.    All Accidents has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

243.    All Accidents has no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services never were provided in the first instance.

244.    All Accidents has no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO, and because it misrepresented the identity of the persons who performed or directly supervised the Fraudulent Services.

245.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that All Accidents has no right to receive payment for any pending bills submitted to GEICO.

## SEVENTH CAUSE OF ACTION
### Against LaRocca
### (Violation of RICO, 18 U.S.C. § 1962(c))

246.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-199, above.

247.    All Accidents is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

248.     LaRocca knowingly has conducted and/or participated, directly or indirectly, in the conduct of All Accidents' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that All Accidents was not eligible to receive under the No-Fault Law because: (i) All Accidents unlawfully was operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (vi) the bills for the Fraudulent Services misrepresented the identity of the persons who performed or directly supervised the Fraudulent Services.

249.     A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

250.     All Accidents' business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which LaRocca operated All Accidents, inasmuch as All Accidents was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order

for All Accidents to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through All Accidents to the present day.

251.    All Accidents is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by All Accidents in pursuit of inherently unlawful goals -- namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

252.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $750,000.00 pursuant to the fraudulent bills submitted through All Accidents.

253.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## EIGHTH CAUSE OF ACTION
### Against All Accidents and LaRocca
### (Under Fla. Stat. 501.201 et. seq.)

254.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-199, above.

255.    All Accidents and LaRocca are actively engaged in trade and commerce in the State of Florida.

256.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

257.    All Accidents and LaRocca engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally-obtain PIP Benefits from GEICO.

258.    The bills and supporting documents submitted by All Accidents and LaRocca to GEICO in connection with the Fraudulent Services were fraudulent in that they misrepresented: (i) All Accidents' eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

259.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of All Accidents and LaRocca has been materially injurious to GEICO and its Insureds.

260.    The conduct of All Accidents and LaRocca was the actual and proximate cause of the damages sustained by GEICO.

261.    All Accidents and LaRocca's unfair and deceptive acts have caused GEICO to sustain damages of at least $750,000.00.

262.    By reason of All Accidents and LaRocca's conduct, GEICO is also entitled to recover costs, and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

**<u>NINTH CAUSE OF ACTION</u>**
**Against All Accidents and LaRocca**
**(Common Law Fraud)**

263.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-199, above.

264.     All Accidents and LaRocca intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills through All Accidents for the Fraudulent Services.

265.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that All Accidents was in compliance with Florida law, and eligible to collect PIP Benefits in the first instance, when in fact All Accidents never was in compliance with Florida law or eligible to collect PIP Benefits; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed; and (v) in many claims, misrepresentations regarding the identity of the persons who performed or directly supervised the Fraudulent Services.

266.     All Accidents and LaRocca intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through All Accidents that were not reimbursable.

267.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $750,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the All Accidents and LaRocca through All Accidents.

268.    All Accidents and LaRocca's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

269.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**TENTH CAUSE OF ACTION**
**Against All Accidents and LaRocca**
**(Unjust Enrichment)**

270.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-199, above.

271.    As set forth above, All Accidents and LaRocca have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

272.    When GEICO paid the bills and charges submitted or caused to be submitted by All Accidents and LaRocca through All Accidents, it reasonably believed that it was legally obligated to make such payments based on All Accidents and LaRocca's improper, unlawful, and/or unjust acts.

273.    All Accidents and LaRocca have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that All Accidents and LaRocca voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

274.    All Accidents and LaRocca's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

275.    By reason of the above, All Accidents and LaRocca have been unjustly enriched in an amount to be determined at trial, but in no event less than $750,000.00.

## ELEVENTH CAUSE OF ACTION
**Against LaRocca Chiropractic Injury**
**(Declaratory Judgment -- 28 U.S.C. §§ 2201 and 2202)**

276.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-199, above.

277.     There is an actual case in controversy between GEICO and LaRocca Chiropractic Injury regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

278.     LaRocca Chiropractic Injury has no right to receive payment for any pending bills submitted to GEICO because it was unlawfully operated in violation of Florida law.

279.     LaRocca Chiropractic Injury has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not lawfully provided or billed to GEICO.

280.     LaRocca Chiropractic Injury has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

281.     LaRocca Chiropractic Injury has no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services never were provided in the first instance.

282.     LaRocca Chiropractic Injury has no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to

inflate the charges submitted to GEICO, and because it misrepresented the identity of the persons who performed or directly supervised the Fraudulent Services.

283.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that LaRocca Chiropractic Injury has no right to receive payment for any pending bills submitted to GEICO.

### TWELFTH CAUSE OF ACTION
**Against LaRocca**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

284.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-199, above.

285.    LaRocca Chiropractic Injury is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

286.    LaRocca knowingly has conducted and/or participated, directly or indirectly, in the conduct of LaRocca Chiropractic Injury's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that LaRocca Chiropractic Injury was not eligible to receive under the No-Fault Law because: (i) LaRocca Chiropractic Injury unlawfully was operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that

80

purportedly were provided in order to inflate the charges submitted to GEICO; and (vi) the bills for the Fraudulent Services misrepresented the identity of the persons who performed or directly supervised the Fraudulent Services. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

287.   LaRocca Chiropractic Injury's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which LaRocca operated LaRocca Chiropractic Injury, inasmuch as LaRocca Chiropractic Injury was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for LaRocca Chiropractic Injury to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through LaRocca Chiropractic Injury to the present day.

288.   LaRocca Chiropractic Injury is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by LaRocca Chiropractic Injury in pursuit of inherently unlawful goals -- namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

289.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $490,000.00 pursuant to the fraudulent bills submitted through LaRocca Chiropractic Injury.

290.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**THIRTEENTH CAUSE OF ACTION**
**Against LaRocca Chiropractic Injury and LaRocca**
**(Under Fla. Stat. 501.201 et. seq.)**

291.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-199, above.

292.     LaRocca Chiropractic Injury and LaRocca are actively engaged in trade and commerce in the State of Florida.

293.     GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

294.     LaRocca Chiropractic Injury and LaRocca engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally-obtain PIP Benefits from GEICO.

295.     The bills and supporting documents submitted by LaRocca Chiropractic Injury and LaRocca to GEICO in connection with the Fraudulent Services were fraudulent in that they misrepresented: (i) LaRocca Chiropractic Injury's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

296.     Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of LaRocca Chiropractic Injury and LaRocca has been materially injurious to GEICO and its Insureds.

297.   The conduct of LaRocca Chiropractic Injury and LaRocca was the actual and proximate cause of the damages sustained by GEICO.

298.   LaRocca Chiropractic Injury and LaRocca's unfair and deceptive acts have caused GEICO to sustain damages of at least $490,000.00.

299.   By reason of LaRocca Chiropractic Injury and LaRocca's conduct, GEICO is also entitled to recover costs, and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

**FOURTEENTH CAUSE OF ACTION**
**Against LaRocca Chiropractic Injury and LaRocca**
**(Common Law Fraud)**

300.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-199, above.

301.   LaRocca Chiropractic Injury and LaRocca intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills through LaRocca Chiropractic Injury for the Fraudulent Services.

302.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that LaRocca Chiropractic Injury was in compliance with Florida law, and eligible to collect PIP Benefits in the first instance, when in fact LaRocca Chiropractic Injury never was in compliance with Florida law or eligible to collect PIP Benefits; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; (iv) in many claims, the representation that the Fraudulent Services actually

were performed, when in many cases they were not actually performed; and (v) in many claims, misrepresentations regarding the identity of the persons who performed or directly supervised the Fraudulent Services.

303.     LaRocca Chiropractic Injury and LaRocca intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through LaRocca Chiropractic Injury that were not reimbursable.

304.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $490,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the LaRocca Chiropractic Injury and LaRocca through LaRocca Chiropractic Injury.

305.     LaRocca Chiropractic Injury and LaRocca's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

306.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTEENTH CAUSE OF ACTION
### Against LaRocca Chiropractic Injury and LaRocca
### (Unjust Enrichment)

307.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-199, above.

308.     As set forth above, LaRocca Chiropractic Injury and LaRocca have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

309.    When GEICO paid the bills and charges submitted or caused to be submitted by LaRocca Chiropractic Injury and LaRocca through LaRocca Chiropractic Injury, it reasonably believed that it was legally obligated to make such payments based on LaRocca Chiropractic Injury and LaRocca's improper, unlawful, and/or unjust acts.

310.    LaRocca Chiropractic Injury and LaRocca have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that LaRocca Chiropractic Injury and LaRocca voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

311.    LaRocca Chiropractic Injury and LaRocca's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

312.    By reason of the above, LaRocca Chiropractic Injury and LaRocca have been unjustly enriched in an amount to be determined at trial, but in no event less than $490,000.00.

**SIXTEENTH CAUSE OF ACTION**
**Against LaRocca Auto**
**(Declaratory Judgment -- 28 U.S.C. §§ 2201 and 2202)**

313.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-199, above.

314.    There is an actual case in controversy between GEICO and LaRocca Auto regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

315.    LaRocca Auto has no right to receive payment for any pending bills submitted to GEICO because it was unlawfully operated in violation of Florida law.

316.    LaRocca Auto has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not lawfully provided or billed to GEICO.

317.    LaRocca Auto has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

318.    LaRocca Auto has no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services never were provided in the first instance.

319.    LaRocca Auto has no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO, and because it misrepresented the identity of the persons who performed or directly supervised the Fraudulent Services.

320.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that LaRocca Auto has no right to receive payment for any pending bills submitted to GEICO.

### SEVENTEENTH CAUSE OF ACTION
**Against LaRocca**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

321.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-199, above.

322.    LaRocca Auto is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

323.    LaRocca knowingly has conducted and/or participated, directly or indirectly, in the conduct of LaRocca Auto's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United

States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over four years seeking payments that LaRocca Auto was not eligible to receive under the No-Fault Law because: (i) LaRocca Auto unlawfully was operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (vi) the bills for the Fraudulent Services misrepresented the identity of the persons who performed or directly supervised the Fraudulent Services.

324.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4".

325.    LaRocca Auto's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which LaRocca operated LaRocca Auto, inasmuch as LaRocca Auto was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for LaRocca Auto to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that

the Defendants continue to attempt collection on the fraudulent billing submitted through LaRocca Auto to the present day.

326.    LaRocca Auto is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by LaRocca Auto in pursuit of inherently unlawful goals -- namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

327.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $710,000.00 pursuant to the fraudulent bills submitted through LaRocca Auto.

328.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**EIGHTEENTH CAUSE OF ACTION**
**Against LaRocca Auto and LaRocca**
**(Under Fla. Stat. 501.201 et. seq.)**

329.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-199, above.

330.    LaRocca Auto and LaRocca are actively engaged in trade and commerce in the State of Florida.

331.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

332.    LaRocca Auto and LaRocca engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally-obtain PIP Benefits from GEICO.

333.    The bills and supporting documents submitted by LaRocca Auto and LaRocca to GEICO in connection with the Fraudulent Services were fraudulent in that they misrepresented: (i) LaRocca Auto's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

334.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of LaRocca Auto and LaRocca has been materially injurious to GEICO and its Insureds.

335.    The conduct of LaRocca Auto and LaRocca was the actual and proximate cause of the damages sustained by GEICO.

336.    LaRocca Auto and LaRocca's unfair and deceptive acts have caused GEICO to sustain damages of at least $710,000.00.

337.    By reason of LaRocca Auto and LaRocca's conduct, GEICO is also entitled to recover costs, and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

### NINETEENTH CAUSE OF ACTION
**Against LaRocca Auto and LaRocca**
**(Common Law Fraud)**

338.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-199, above.

339.    LaRocca Auto and LaRocca intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills through LaRocca Auto for the Fraudulent Services.

340.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that LaRocca Auto was in compliance with Florida law, and eligible to collect PIP Benefits in the first instance, when in fact LaRocca Auto never was in compliance with Florida law or eligible to collect PIP Benefits; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed; and (v) in many claims, misrepresentations regarding the identity of the persons who performed or directly supervised the Fraudulent Services.

341.     LaRocca Auto and LaRocca intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through LaRocca Auto that were not reimbursable.

342.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $710,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the LaRocca Auto and LaRocca through LaRocca Auto.

343.     LaRocca Auto and LaRocca's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

344.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### TWENTIETH CAUSE OF ACTION
### Against LaRocca Auto and LaRocca
### (Unjust Enrichment)

345.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-199, above.

346.    As set forth above, LaRocca Auto and LaRocca have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

347.    When GEICO paid the bills and charges submitted or caused to be submitted by LaRocca Auto and LaRocca through LaRocca Auto, it reasonably believed that it was legally obligated to make such payments based on LaRocca Auto and LaRocca's improper, unlawful, and/or unjust acts.

348.    LaRocca Auto and LaRocca have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that LaRocca Auto and LaRocca voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

349.    LaRocca Auto and LaRocca's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

350.    By reason of the above, LaRocca Auto and LaRocca have been unjustly enriched in an amount to be determined at trial, but in no event less than $710,000.00.

### JURY DEMAND

351.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

WHEREFORE, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

a.　　　On the First Cause of Action Against LaRocca Chiropractic, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that LaRocca Chiropractic has no right to receive payment for any pending bills submitted to GEICO;

b.　　　On the Second Cause of Action against LaRocca, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $8,800,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

c.　　　On the Third Cause of Action against LaRocca Chiropractic and LaRocca, compensatory damages in an amount to be determined at trial but in excess of $8,800,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

d.　　　On the Fourth Cause of Action against LaRocca Chiropractic and LaRocca, compensatory damages in an amount to be determined at trial but in excess of $8,800,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

e.　　　On the Fifth Cause of Action against LaRocca Chiropractic and LaRocca, more than $8,800,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

f.　　　On the Sixth Cause of Action against All Accidents, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that LaRocca Chiropractic has no right to receive payment for any pending bills submitted to GEICO;

92

g.      On the Seventh Cause of Action against LaRocca, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $750,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

h.      On the Eighth Cause of Action against All Accidents and LaRocca, compensatory damages in an amount to be determined at trial but in excess of $750,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

i.      On the Ninth Cause of Action against All Accidents and LaRocca, compensatory damages in an amount to be determined at trial but in excess of $750,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

j.      On the Tenth Cause of Action against All Accidents and LaRocca, more than $750,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

k.      On the Eleventh Cause of Action against LaRocca Chiropractic Injury, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that LaRocca Chiropractic Injury has no right to receive payment for any pending bills submitted to GEICO;

l.      On the Twelfth Cause of Action against LaRocca, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $490,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

m.      On the Thirteenth Cause of Action against LaRocca Chiropractic Injury and LaRocca, compensatory damages in an amount to be determined at trial but in excess of $490,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

n.      On the Fourteenth Cause of Action against LaRocca Chiropractic Injury and LaRocca, compensatory damages in an amount to be determined at trial but in excess of

$490,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

o.        On the Fifteenth Cause of Action against LaRocca Chiropractic Injury and LaRocca, more than $490,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

p.        On the Sixteenth Cause of Action against LaRocca Auto, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that LaRocca Auto has no right to receive payment for any pending bills submitted to GEICO;

q.        On the Seventeenth Cause of Action against LaRocca, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $710,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

r.        On the Eighteenth Cause of Action against LaRocca Auto and LaRocca, compensatory damages in an amount to be determined at trial but in excess of $710,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

s.        On the Nineteenth Cause of Action against LaRocca Chiropractic Injury and LaRocca, compensatory damages in an amount to be determined at trial but in excess of $710,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

t.        On the Twentieth Cause of Action against LaRocca Chiropractic Injury and LaRocca, more than $710,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: October 22, 2024

_/s/ Max Gershenoff_____

Max Gershenoff (FBN 1038855)
John P. Marino (FBN 814539)
Lindsey R. Trowell (FBN 678783)
Yonatan Bernstein (FBN 1035899)
Kristen Wenger (FBN 92136)
RIVKIN RADLER, LLP
Riverplace Tower
1301 Riverplace Blvd.
Suite 1000
Jacksonville, FL 32207
Phone:  (904) 791-8948
Facsimile:  (904) 598-6225
Max.Gershenoff@rivkin.com
John.Marino@rivkin.com
Lindsey.Trowell@rivkin.com
Yonatan.Bernstein@rivkin.com
Kristen.Wenger@rivkin.com
*Counsel for Plaintiffs*